# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

| | |
|---|---|
| PACKGEN, | ) |
|     Plaintiff | ) ) ) ) |
| v. | ) Civil Action No. 11-_____ |
| BP EXPLORATION & PRODUCTION, INC., | ) ) ) ) |
| and | ) ) |
| BP AMERICA PRODUCTION COMPANY, | ) ) ) ) |
| and | ) ) |
| BP, p.l.c., | ) ) |
|     Defendants | ) |

## COMPLAINT

Plaintiff Packgen complains against defendants BP Exploration & Production, Inc., BP America Production Company, and BP, p.l.c., as follows:

## PARTIES

1. Packgen ("Packgen") is a Maine corporation whose principal place of business is in Auburn, Maine.

2. Upon information and belief, BP Exploration & Production, Inc. ("BPE&P") is a Delaware corporation whose principal place of business is in Texas.

3. Upon information and belief, BP America Production Company ("BPAPC") is a Delaware corporation whose principal place of business is in Texas.

4. Upon information and belief, BP, p.l.c., is an entity organized under the laws of England and Wales. Upon information and belief, BPE&P and BPAPC are direct or indirect subsidiaries of BP, p.l.c.

5. BPE&P, BPAPC, and BP, p.l.c. are hereinafter referred to collectively as "BP" in this Complaint.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. § 1332 because the amount in controversy in this matter exceeds $75,000 and the parties are citizens of different states.

7. This Court has personal jurisdiction over BP as a result of its knowing and intentional transaction of business with Packgen in the State of Maine.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

A. **The Deepwater Horizon Incident**

9. On April 20, 2010, an oil drilling rig known as *Deepwater Horizon* exploded and caught fire. The rig burned for nearly forty-eight hours before being submerged into the sea. On its way down to the seafloor, the long riser pipe broke and oil began to gush out of control from the seafloor.

10. The emergency valve on the base of the well failed to seal the well. As a result, crude oil spewed out into the Gulf of Mexico uncontrollably at a rate of 10,000 to 20,000 barrels of oil per day for nearly three months, covering almost 10,000 square miles, and spreading with winds and currents toward coastlines in Texas, Louisiana, Mississippi, Alabama, Florida, and the Caribbean.

11. The oil spill that resulted from the *Deepwater Horizon* explosion was a disaster of nearly unprecedented magnitude and, in many respects, was a matter of grave concern for the entire United States.

12. The *Deepwater Horizon* incident had deep consequences for jobs, businesses, communities, the environment, and the oil industry at large. Moreover, the incident threatened the very existence of BP as a company.

13. BP responded to the oil spill in multiple, parallel ways, including efforts to prevent oil from fouling the shoreline. Those efforts included the deployment of significant amounts of oil containment boom.

14. BP's initial efforts to contain the spill were hampered by, among other problems: (a) the shortage of available boom; (b) the technical difficulties associated with quickly producing so-called "hard boom" (*i.e.*, nonabsorbent boom); and (c) interconnectivity problems between boom produced by different manufacturers.

15. In the days and weeks immediately following the *Deepwater Horizon* disaster, because of the rapid spread of oil that covered hundreds of miles of shoreline, both government and BP representatives made numerous public and private emergency requests for production and delivery of boom to the Gulf of Mexico. Both the President of the Unites States and the Governor of Louisiana declared states of emergency. President Obama also stated that this was the worst environmental disaster that the United States had ever faced.

**B.     Packgen and its Initial Involvement with BP**

16. Packgen is an innovator, custom designer, and manufacturer of composite packaging materials and containers for shipping and storage of materials used in the chemical, oil refining, and food processing industries. It has a long history of designing unique solutions for liquid and hazardous product containment problems encountered by its customers.

17. Shortly after the BP oil spill, Packgen responded to the calls for boom by: (a) identifying and testing an innovative way to produce large quantities of boom quickly, efficiently, and effectively using a liquid foam injection manufacturing process; and (b) informing BP representatives of its capability and willingness to respond to BP's emergency needs.

18. Dan Forte, a Packgen consultant ("Forte"), spoke with Mario Araya, a BP employee ("Araya"), on multiple occasions in late April or early May 2010.

19. During these conversations between Araya and Forte, Araya told Forte that:

(a) BP had a critical and urgent need for boom, and that BP's needs exceeded industry production capacity;

(b) BP had no specifications for the boom and boom produced to the standards promulgated by the American Society for Testing and Materials (the "ASTM standards") was sufficient;

(c) BP "had a need for 5.0 million feet" of boom; and

(d) BP had been duped by a company that purported to have boom available for sale (when it apparently did not) and, a result, BP wanted to inspect Packgen's facility and verify its production method and capacity.

20. During these conversations between Araya and Forte, Araya and Forte also discussed pricing of the boom. Araya made it clear that, given the emergency BP was facing, pricing was only a secondary consideration. Araya and Forte negotiated the price of the boom and agreed that a price of $18.75 per foot was acceptable.

C. **The May 11 Meeting in Auburn**

21. BP employee Max Lyoen ("Lyoen") flew to Maine to inspect Packgen's facility in Auburn, Maine on May 11, 2010. Lyoen met with several Packgen employees and representatives, including Forte, Packgen's president, John Lapoint ("Lapoint"), and Packgen's national sales manager, Don Roberts ("Roberts").

4

22. During his inspection, Lyoen toured Packgen's facility and production line and discussed Packgen's production capacity, process, and boom design with Lapoint and Roberts.

23. During his inspection, Lyoen and Packgen representatives discussed the universal connector (to connect boom sections) used by Packgen. Packgen had modified the connector to make it compatible with boom already purchased by BP from China and other sources. This was necessary because some of the boom already purchased by BP did not meet ASTM standards.

24. During his inspection, Lyoen informed Packgen representatives that the universal connector chosen by Packgen, as modified, was acceptable.

25. During his inspection, Lyoen said that 18" boom produced to ASTM standards was sufficient for the emergency purposes needed by BP.

26. During his inspection, Lyoen repeated to Packgen representatives that: (a) BP had a dire need for millions of feet of boom; and (b) other manufacturers could only produce approximately 8,000 feet per week.

27. During his inspection, Packgen representatives disclosed to Lyoen the unique production process that allows Packgen to quickly produce far more boom than other manufacturers.

28. During his inspection, based on his observations of Packgen's facility and its unique production process, Lyoen verbally confirmed that Packgen "could do around 40,000 to 60,000 feet of boom per day."

29. During his inspection, Lyoen told Packgen representatives that BP had been purchasing boom from foreign manufacturers, but desired to purchase boom from domestic manufacturers.

30. During his inspection, Lyoen told Packgen representatives that BP would purchase Packgen's full capacity as soon as Packgen: (a) provided the third-party testing results showing compliance with ASTM standards; and (b) established that its procedures met BP's requirements.

31. Lyoen told Packgen representatives that BP's purchasing department was "inundated" and, because of the urgency of the situation, BP was "using some verbals."

32. During his inspection, Lapoint told Lyoen that Packgen would sell boom to BP to meet its needs.

33. Packgen immediately took the steps necessary to produce 18" boom that complied with ASTM standards to meet BP's needs.

34. To meet BP's need for boom, Packgen made commitments to purchase substantial quantities of materials from its suppliers, including 1.5 million feet of polypropylene, 1,100 pounds of thread, 1.5 million feet of strapping, 50,000 pounds of foam, and 250,000 feet of chain. Packgen purchased equipment, including, without limitation, a pickup truck and a forklift, to move the materials from its warehouse to its factory. Packgen also hired additional labor to support the increase in production.

**D.    Subsequent Representations by BP**

35. On Friday, May 21, 2010, Packgen provided third-party testing results to BP.

36. The third-party test results verified that Packgen's boom met or exceeded all ASTM standards.

37. On Sunday, May 23, 2010, around 8:00 p.m., another BP employee, Matthew Pavlas ("Pavlas"), called Roberts on his cell phone. During this conversation:

    (a)    Pavlas asked Roberts about the availability of Packgen's boom;

    (b)    Pavlas told Roberts that BP "needed 100,000 feet" and would "take what you've got;"

   (c) Roberts estimated that Packgen had approximately 40,000 feet of boom available for immediate delivery to BP; and

   (d) Pavlas told Roberts that BP intended to purchase Packgen's entire stock of boom.

38. By the end of May 2010, BP had: (a) told Packgen that BP would purchase Packgen's full capacity once Packgen provided favorable third-party test results that met BP's requirements; (b) responded favorably to the third-party test results when provided; and (c) confirmed that BP intended to purchase all of the boom that Packgen could manufacture.

**E.** **Requests for Design Changes and Technical Information**

39. Throughout the rest of May and into the middle of June 2010, BP representatives Luis Suarez ("Suarez"), Chuck Bigi ("Bigi"), John McFadden ("McFadden"), and Donald May ("D. May") made repeated requests to Packgen representatives for technical information and design changes regarding the boom.

40. Throughout the rest of May and into the middle of June 2010, BP employee Deenadayalan Arcot ("Arcot") stated to Packgen representatives that BP would: (a) order 14,000 linear feet of boom as a trial order for testing purposes; and (b) follow up with more substantial orders after testing showed that Packgen's boom met BP's specifications.

41. In late May 2010, BP identified to Packgen two issues relating to the connector plates on Packgen's boom. Specifically, in an e-mail to other BP employees (including Lyoen and Pavlas) dated May 26, 2010, Bigi told Packgen representatives that the connector plates originally used by Packgen might be susceptible to corrosion and interconnectivity issues and that BP "cannot use [Packgen's boom] in current design."

42. Bigi's May 26th e-mail was forwarded to Roberts by Arcot, on May 26, 2011. Arcot told Roberts that, "I want to work with you."

43. Later that day (May 26th), Lapoint, Roberts, and Bigi participated in a conference call to discuss the boom that Packgen was manufacturing for BP.  During that call, Bigi told Roberts and Lapoint that "if you get the ASTM aluminum connector, you'll be in compliance with what we are looking for."  If you get that connector, "I will send someone up there to finalize the quality audit."

44. Immediately thereafter, Packgen purchased a substantial volume of aluminum universal slide connector plates.

## F. The June 11th Meeting in Auburn

45. On June 8, 2010, Suarez wrote to Roberts and stated that Suarez would be at Packgen's facility on June 11, 2010.  Suarez wrote:

> The scope of the assessment is critical elements of your quality management system, production capacity and the product conformance with BP requirements and applicable industry standards (e.g. ASTM F 1523, ASTM F 2438).

46. On June 11, 2010, Suarez conducted an inspection and assessment of Packgen's manufacturing facility in Auburn, Maine.

47. During the inspection on June 11, 2010, Suarez stated to Packgen representatives that it was in BP's best interests to purchase boom manufactured in the United States.

48. Following his inspection on June 11, 2010, Suarez confirmed Lyoen's initial estimate that Packgen could produce at least 40,000 feet of boom per day, and Suarez again confirmed that such capacity was far greater than that of other domestic (and foreign) manufacturers, and that BP needed and would purchase over 1,000,000 feet of boom from domestic manufacturers.

49. During or following his inspection on June 11, 2010, Suarez stated that: (a) BP would purchase all of the boom that Packgen could produce once Packgen was approved as a

vendor; (b) BP's approval of Packgen as a vendor was a mere formality; and (c) BP would keep Packgen "busy for a long time."

50. During or following his inspection on June 11, 2010, Suarez also requested that Packgen ship a sample of 7,000 feet of boom to BP for a field test in Alabama.

51. During the June 11th inspection, Roberts also provided another test report to Suarez.

**G.    BP's Further Requests for Design Changes and the First Field Test**

52. Packgen continued to work at the direction of BP to provide requested information and to make requested technical changes to its boom. This process entailed the redrawing, redesign, and reconfiguration of the boom and boom design on numerous occasions, and toward that end, the transmission of drawings, specifications, and technical information to BP.

53. In addition, Packgen continued to purchase materials and machinery, including, without limitation, 40,000 pounds of foam and a foam injector to produce the foam.

54. On June 15, 2010, BP, acting through Suarez, also asked Packgen to send "a 100ft sample for evaluation" to a staging yard in Theodore, Alabama. Later that day, Suarez told Packgen representatives that he had "rushed with the request," stating that his earlier email had been mistaken, and that BP needed a 500-600 foot sample instead.

55. Suarez's request for a 500-600 foot sample was a reduction in the 7,000 feet previously requested for testing in Theodore, Alabama. Suarez stated that this reduction in quantity for the field trial was made to accelerate the approval process.

56. On June 16, 2010, BP requested three specific design changes to Packgen's boom. At the same time, BP noted issues relating to possible delamination, water ingression, and oil absorption.

57. Later that day, on June 16, 2010, Roberts sent an e-mail to Suarez and Bigi. In that message, Roberts addressed the issues noted by BP earlier in the day. He also stated that Packgen

9

was "working hard to make the best possible product for you." Bigi responded, in part, by writing: "I truly appreciate your support."

58. On June 21, 2010, Suarez again confirmed his request for delivery of 600 feet of boom to Alabama.

59. BP conducted the field test of Packgen's boom on June 30, 2010, at a logistics site near Mobile, Alabama.

60. At the field test, Roberts, who attended the test on behalf of Packgen, spoke with Bigi, who confirmed that BP needed more than 1,000,000 feet of boom.

61. The field test was successful, but did raise one concern for BP. Because Packgen's boom was constructed with a fold of polypropylene material, it filled up with water while being towed for deployment by boats. While deployment companies thought that the extra water in the boom might make Packgen's boom more stable and, therefore, allow it to perform better than traditional boom in rough water, BP representatives were concerned that Packgen's boom would be too heavy for small boats to tow.

62. Packgen immediately addressed BP's concerns by adding another stitch to the pocket and drainage holes to its boom. The modifications kept the boom from filling with water.

63. By July 6, 2010, Packgen informed BP of these modifications. Packgen also informed BP that it was prepared to: (a) produce the modified boom; and (b) test it locally in Maine or send it to Alabama for testing.

64. In response, Suarez agreed that a test conducted in Maine would suffice to demonstrate that the pocket modification addressed BP's concerns.

**H.**     **More BP Requests for Revisions and the Second Field Test**

65. On July 7, 2010, BP, through Suarez and McFadden informed Packgen that because of changing needs, its objectives had changed and that it now needed, and would only

accept, 24" boom, not the 18" boom previously ordered by BP. Suarez asked Packgen to modify its boom to satisfy the new specification. He also told Packgen that BP needed 1,500,000 feet (up from 1,000,000 feet) of 24" boom immediately.

66. As a result of this directive from BP, Packgen's engineering team made the necessary changes to the production line to enable Packgen to produce 24" boom. At BP's request, Packgen then completed a field water test of the newly-configured boom and forwarded a video recording of the test to BP.

67. BP, through its representatives Suarez and McFadden, then requested that Packgen ship 200 feet of 24" boom to BP for follow-up testing in Alabama before August. Packgen complied with BP's request and promptly shipped 200 feet of 24" boom to BP.

68. BP then conducted its second field test at its test site in Alabama on July 21, 2010. This test validated the design modifications to Packgen's boom. Following this field test, McFadden gave Packgen verbal approval for Packgen's boom.

69. Suarez informed Packgen that it was one of just three approved suppliers for 24" boom and that the other two suppliers could produce just 10,000 feet per week compared to Packgen's baseline of 40,000 feet per day.

I. **BP's Failure to Purchase Boom**

70. BP informed Packgen that, although the *Deepwater Horizon* well had been capped on July 15, 2010, BP expected the cleanup efforts to continue at least until the end of 2010 and that boom would be needed for these efforts.

71. On August 21, 2010, Roberts received an e-mail from BP's representative, Donn Chadick ("Chadick"). Chadick wrote:

> PacGen [sic] has been added to BP's Approved Vendor List for Containment Boom. Your product was reviewed and recommended by Supplier Quality Management and BP's Technical Authorities.

11

72. As of August 21, 2010, Packgen had approximately 12 miles of completed boom in its warehouse, as well as substantial amounts of materials that had been purchased to produce additional boom, but could not be used for Packgen's core business.

73. With the exception of the test samples described above, BP failed or refused to accept delivery of the boom manufactured by Packgen.

74. BP has failed or refused to pay Packgen for any of the boom manufactured by Packgen.

75. According to media reports, BP lured many other American-based manufacturers into believing that it intended to purchase boom from them, thereby increasing the supply of boom, but then failed purchase such boom.  (*See* Wall Street Journal article dated August 31, 2010 attached hereto as **Exhibit A**).

## COUNT I
### (Negligent Misrepresentation)

76. Packgen repeats and realleges the allegations set forth above as though fully set forth in this Court I.

77. BP made the representations to Packgen referred to above and in particular those set forth in paragraphs 19, 24-26, 29-31, 37-38, 40, 48-49, 54, 55, 57, 60, 64, 65, 67, 68, 69-70, and 75 (the "Misrepresentations") in the course of its business in which it has a pecuniary interest. The Misrepresentations were, in whole, or in part, statements of fact, opinion, intention, or law.

78. The Misrepresentations were, in whole or in part, false.

79. Packgen relied upon the Misrepresentations in making its decision to gear up to produce boom, share information, drawings and prototypes with BP, and purchase materials and equipment, and hire workers.

80. Packgen's reliance upon the Misrepresentations in making its decision to gear up to produce boom, share information, drawings and prototypes with BP, and purchase materials and equipment, and hire workers, was reasonable.

81. BP failed to exercise reasonable care in communicating the Misrepresentations to Packgen.

82. As a direct and proximate result of the Misrepresentations, Packgen has suffered damages, including, without limitation, general, expectation, benefit of the bargain, reliance, restitution, compensatory, and/or consequential damages.

## COUNT II
### (Intentional Misrepresentation)

83. Packgen repeats and realleges the allegations set forth above as though if fully set forth in this Count II.

84. BP made the Misrepresentations to Packgen.

85. The Misrepresentations were, in whole or in part, false.

86. The Misrepresentations were, in whole or in part, statements of fact, opinion, intention, or law.

87. BP made the Misrepresentations to Packgen with knowledge of their falsity or in reckless disregard for whether they were true or false.

88. BP made the Misrepresentations to Packgen for the purpose of inducing Packgen to act in reliance upon the Misrepresentations.

89. Packgen justifiably relied upon the Misrepresentations as true to its detriment.

90. As a direct and proximate result of the Misrepresentations, Packgen has suffered damages, including, without limitation, general, expectation, benefit of the bargain, reliance,

restitution, compensatory, and/or consequential damages, and is entitled to the recovery of punitive damages.

## COUNT III
### (Breach of Contract)

91. Packgen repeats and realleges the allegations set forth above as though fully set forth in this Court III.

92. Packgen and BP entered into one or more contracts whereby Packgen agreed to sell, and BP agreed to purchase, Packgen's output of 18" and then 24" boom (1.2 and 1.5 million feet, respectively) at a purchase price of not less than $14.95 per linear foot and not more than $18.75 per linear foot.

93. All of the conditions precedent, if any, to BP's obligation to purchase Packgen's output of boom were satisfied and/or waived by BP.

94. BP breached the contract for the purchase of Packgen's production of boom by, *inter alia*, failing or refusing to take possession of and pay for the boom.

95. As a direct result of BP's breach of the contract, Packgen has suffered damages, including, without limitation, general, expectation, benefit of the bargain, reliance, restitution, compensatory, and/or consequential damages.

## COUNT IV
### (Restitution/Quasi-Contract/Unjust Impoverishment)

96. Packgen repeats and realleges the allegations set forth above as though fully set forth in this Court IV.

97. Following the *Deepwater Horizon* incident, BP had a duty to take steps to mitigate the damages caused by the oil spill, including, without limitation, containing the oil and preventing the oil from reaching the shore.

98. Following the *Deepwater Horizon* incident, boom was immediately necessary to satisfy the requirements of public and environmental health, safety, and welfare.

99. At or about the time of the *Deepwater Horizon* incident, BP represented to Packgen that it neither had nor had access to sufficient quantities of adequate boom.

100. BP represented to Packgen that its inability to obtain sufficient boom was caused, in part, by limited production capacity in the boom manufacturing industry.

101. Packgen designed and tested a unique method of quickly producing boom through a liquid foam injection production process.

102. Packgen shared with BP, at its request, the liquid foam injection process, technical drawings, design information, and boom prototypes.

103. BP acknowledged that Packgen's liquid foam injection production process was substantially more efficient (on a foot per day basis) than that of other vendors of boom with which BP was dealing.

104. Throughout May-July 2010, BP led Packgen to believe that: (a) if Packgen obtained ASTM certification, BP would purchase Packgen's output of 18" inch boom; and/or (b) if Packgen met BP's additional design requirements, BP would purchase Packgen's output of 24" inch boom.

105. Packgen took the steps necessary to produce, and did produce, 18" boom and, subsequently, 24" boom that met BP's requirements.

106. BP formally acknowledged that Packgen's boom was acceptable and that Packgen was a qualified vendor.

107. BP failed: (a) to pay for the information and boom delivered by Packgen; or (b) to provide the anticipated boom orders to Packgen.

108. Packgen was ready, willing, and able to supply boom that satisfied BP's constantly-evolving requirements.

109. Packgen did not act, with respect to BP and the events described in this Complaint, officiously.

110. As a direct result of BP's actions, Packgen has suffered damages, including, without limitation, general, expectation, benefit of the bargain, reliance, restitution, compensatory, and/or consequential damages, and is entitled to the recovery of punitive damages..

## COUNT V
### (Promissory Estoppel)

111. Packgen repeats and realleges the allegations set forth above as though fully set forth in this Court V.

112. BP promised that it would purchase all the boom that Packgen could produce.

113. In reliance on BP's promises, Packgen incurred costs, including labor and material costs, for the sole purpose of manufacturing boom to assist BP in responding to the *Deepwater Horizon* disaster.

114. In reliance on BP's promises and in light of the circumstances surrounding the *Deepwater Horizon* incident, Packgen manufactured thousands of feet of boom for sale to BP, and prepared itself to manufacture over one million feet of boom.

115. In light of the circumstances surrounding the *Deepwater Horizon* incident, BP reasonably should have known that Packgen would undertake immediate efforts to manufacture the boom that BP promised to purchase from Packgen.

116. Packgen did, in fact, undertake immediate and significant efforts to manufacture the boom that BP promised to purchase from Packgen.

117. Packgen's efforts to manufacture the boom that BP offered to purchase were reasonable under the circumstances.

118. As a result of BP's failure or refusal to purchase said boom from Packgen, injustice can be avoided only by enforcing BP's promises.

119. As a direct result of BP's actions, Packgen has suffered damages, including without limitation, general, expectation, benefit of the bargain, reliance, restitution, compensatory, and/or consequential damages, and is entitled to the recovery of punitive damages.

WHEREFORE, Packgen requests that the Court enter judgment against BPE&P, BPAPC, and BP, p.l.c., jointly and severally, in the full amount of Packgen's (a) general, expectation, benefit of the bargain, reliance, restitution, compensatory, punitive and/or consequential damages, (b) award Packgen its costs and, if appropriate, legal fees, and (c) grant such other and further relief as it deems just and appropriate in light of the facts.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Packgen hereby demands a jury trial on all issues triable by jury.

Date: October 19, 2011

/s/  Leonard M. Gulino
Leonard M. Gulino, Esq.
Michael A. Fagone, Esq.
Jeremy R. Fischer, Esq.
BERNSTEIN, SHUR, SAWYER & NELSON, P.A.
100 Middle Street, PO Box 9729
Portland, Maine  04104-5029
(207) 774-1200
lgulino@bernsteinshur.com
mfagone@bernsteinshur.com
jfischer@bernsteinshur.com