UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

PACKGEN,                                  )
                                          )
                    Plaintiff,            )
                                          )
          v.                              )
                                          )
BP EXPLORATION &                          )
PRODUCTION, INC.,                         )
                                          )        2:11-cv-00393-JAW
and                                       )
                                          )
BP AMERICA PRODUCTION                     )
COMPANY,                                  )
                                          )
                    Defendants.           )

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

This diversity case arose in the wake of the well-publicized *Deepwater Horizon* oil spill. When the oil began to spill, Packgen, a Maine producer of packaging products, saw an opportunity to manufacture and sell oil containment boom. Packgen worked to negotiate a sale to BP for several months, altering its boom design based on BP's input, and subjecting its boom to field tests and third-party assessments. Ultimately, however, Packgen was not added to BP's list of approved vendors until after the oil had stopped spilling, and BP never purchased any boom from Packgen. Packgen was able to sell 60,000 feet of boom to another purchaser at a depressed price, but claims that BP reneged on an oral agreement and seeks recovery for its losses under a variety of legal theories. BP raises a statute of frauds defense and moves for summary judgment. The Court concludes

that there is no genuine issue of material fact and grants summary judgment for BP on all counts.

## I.    STATEMENT OF FACTS

### A.    Procedural History

On October 19, 2011, Packgen filed a complaint in this Court against BP Exploration & Production, Inc., BP America Production Company, and BP, p.l.c., alleging misrepresentation, breach of contract, and other claims related to an alleged oral contract for the sale of oil containment boom.  *Compl.* (ECF No. 1).  On November 14, 2011, Packgen voluntarily dismissed BP, p.l.c.  *Notice of Voluntary Dismissal of Def. BP, P.L.C.* (ECF No. 8).  The remaining Defendants (collectively BP) answered the Complaint on December 5, 2011.  *Answer and Affirmative Defenses of BP Exploration & Production, Inc. and BP America Production Co.* (ECF No. 12).  BP filed an amended answer on February 13, 2012.  *Am. Answer of BP Exploration & Production, Inc. and BP America Production Co.* (ECF No. 22).

BP moved for summary judgment and requested oral argument on September 10, 2012.  *Defs. BP Exploration & Production, Inc., and BP America Production Co.'s Mot. for Summ. J. and Request for Oral Argument* (ECF No. 41); *Defs.' Mem. in Support of Its Mot. for Summ. J.* (ECF No. 42-1) (*Defs.' Mot.*); *Statement of Undisputed Facts and Defs.' Suppl. Facts* (ECF No. 42-2) (DSMF).  Packgen responded on October 2, 2012.  *Pl. Packgen's Mem. in Opp'n to Def. BP's Mot. for a Summ. J.* (ECF No. 79) (*Pl.'s Opp'n*); *Packgen's Objections and Resps. to Defs.' Statement of Undisputed Facts and Pl.'s Suppl. Facts* (ECF No. 80) (PRDSMF and

2

PSAMF).  BP replied on October 15, 2012.  *Reply Brief in Support of Defs.' Mot. for Summ. J.* (ECF No. 97) (*Defs.' Reply*); *Defs.' Objections and Resps. to Pl.'s Suppl. Facts* (ECF No. 98) (DRPSAMF).

Packgen filed a supplemental memorandum on October 16, 2012.  *Pl. Packgen's Suppl. Mem. in Opp'n to Def. BP's Mot. for a Summ. J.* (ECF No. 99) (*Pl.'s Suppl. Opp'n*); *Packgen's Additional Statement of Material Facts Pursuant to Local Rule 56(c)* (ECF No. 99-1) (PSAMF).  BP responded on October 19, 2012.  *Suppl. Reply Brief in Support of Defs.' Mot. for Summ. J.* (ECF No. 104) (*Defs.' Suppl. Reply*); *Defs.' Objections and Resps. to Packgen's Additional Statement of Material Facts* (ECF No. 105) (DRPSAMF).  Packgen responded to BP's objections on October 29, 2012.  *Packgen's Resp. to BP's Objections to Packgen's Additional Statements of Material Fact, Pursuant to Local Rule 56(e)* (ECF No. 107) (*Pl.'s 56(e) Sur-Reply*).

With the Court's leave, *Order* (ECF No. 113), Packgen filed another statement of material facts on June 10, 2013.  *Packgen's Additional Statement of Material Facts Pursuant to Local Rule 56(c)* (ECF No. 115) (PSAMF).  BP responded on June 17, 2013.  *Defs.' Objections and Resps. to Packgen's Additional Statement of Material Facts Pursuant to Local Rule 56(c)* (ECF No. 117) (DRPSAMF).  Packgen replied on June 26, 2013.  *Packgen's Resp. to BP's Objections to Packgen's Additional Statements of Material Fact, Pursuant to Local Rule 56(e)* (ECF No. 118) (*Pl.'s Second 56(e) Sur-Reply*).

The Court heard oral argument on June 26, 2013.  *Minute Entry* (ECF No. 119).  On June 27, 2013, Packgen submitted additional caselaw in response to the

Court's questions at oral argument.  *Notice/Correspondence* (ECF No. 120).  In response to Packgen's post-argument submission and with the Court's approval, *Order* (ECF No. 123), BP filed a supplemental brief directed to the new caselaw that Packgen presented after oral argument.  *Defs.' Suppl. Br.* (ECF No. 124).

### B.   The Facts

#### 1.   The Oil Spill

An oil drilling rig called *Deepwater Horizon* caught fire on April 20, 2010, sank, and began spilling an estimated 5000 barrels of oil a day into the Gulf Coast. DSMF ¶ 1; PRDSMF ¶ 1; PSAMF ¶ 1; DRPSAMF ¶ 1.  By April 30, 2010, the oil spill spanned 600 square miles.  PSAMF ¶ 2; DRPSAMF ¶ 2.  Oil washed ashore on the Chandeleur Island of Louisiana on or about May 7, 2010.  DSMF ¶ 2; PRDSMF ¶ 2.  Federal and local officials declared states of emergency.  DSMF ¶ 6; PRDSMF ¶ 6.

BP's response to the oil spill was multi-faceted and included the deployment of oil containment boom.  DSMF ¶ 3; PRDSMF ¶ 3.  Following the spill, BP had a critical need for millions of feet of 18" oil containment boom, but encountered challenges related to availability, production, and interconnectivity.  PSAMF ¶ 4; DRPSAMF ¶ 4; DSMF ¶ 4; PRDSMF ¶ 4.  BP explored numerous avenues for procuring containment boom.  DSMF ¶ 5; PRDSMF ¶ 5.  BP had no standard specification for boom at the time of the Gulf Spill.[1]  PSAMF ¶ 3; DRPSAMF ¶ 3.

---

[1]     PSAMF ¶ 3 also includes the statement that "BP had not purchased any boom prior to the Gulf Spill," but BP objected that this statement is not supported by the record citation.  DRPSAMF ¶ 3.  Having reviewed the record citation, the Court agrees and strikes this portion of PSAMF ¶ 3.  *See Bigi 30(b)(6) Dep.*, 29:22-25 (ECF No. 80-5).

Given its critical need, BP placed large orders for boom with companies that were new to the boom manufacturing industry.[2]  PSAMF ¶ 5; DRPSAMF ¶ 5.  BP's procurement division was not buying boom to any specific specification.[3]  PSAMF ¶ 6; DRPSAMF ¶ 6.

### 2.   Packgen Sees an Opportunity

Packgen is a small Maine business that employs approximately thirty workers in its headquarters in Auburn, Maine.[4]  PSAMF ¶ 7; DRPSAMF ¶ 7. Packgen designs and manufactures composite packaging materials and containers for shipping and storage of materials used in the chemical, oil refining, and food processing industries.  DSMF ¶ 7; PRDSMF ¶ 7.  Packgen is a leading manufacturer and supplier of packaging containers that hold environmental materials.  PSAMF ¶ 8; DRPSAMF ¶ 8.

Prior to April 2010, Packgen had never manufactured oil containment boom. DSMF ¶ 8; PRDSMF ¶ 8; PSAMF ¶ 10; DRPSAMF ¶ 10.  Packgen's president and owner John Lapoint saw an opportunity both to help Packgen's business and to assist the necessary remediation in response to the national disaster.  PSAMF ¶ 12; DRPSAMF ¶ 12.  Packgen realized that it could manufacture boom by modifying its manufacturing operations for packaging containers.  PSAMF ¶ 9; DRPSAMF ¶ 9.

---

[2]      BP interposed a qualified response.  DRPSAMF ¶ 5.  In accordance with its obligation to view the facts in the light most favorable to Packgen, the Court deems the statement admitted for purposes of summary judgment.
[3]      BP interposed a qualified response.  DRPSAMF ¶ 6.  In accordance with its obligation to view the facts in the light most favorable to Packgen, the Court deems the statement admitted for purposes of summary judgment.
[4]      BP interposed a qualified response.  DRPSAMF ¶ 7.  In accordance with its obligation to view the facts in the light most favorable to Packgen, the Court deems the statement admitted for purposes of summary judgment.

5

In April and May 2010, Packgen applied its expertise using woven polypropylene in making packaging containers to create a manufacturing process that produced boom at a daily production rate far exceeding that of other boom manufacturers.   PSAMF ¶ 11; DRPSAMF ¶ 11; DSMF ¶ 22; PRDSMF ¶ 22. Packgen began constructing boom manufacturing equipment no later than April 28, 2010—prior to discussions with BP.[5]  DSMF ¶¶ 19, 23; PRDSMF ¶¶ 19, 23.  Prior to BP's visit, Packgen performed float tests on a small portion of boom which contained materials which would not be used in the final product.[6]  DSMF ¶ 24; PRDSMF ¶ 24.  At the time it began manufacturing boom, Packgen was confident that boom would become a permanent part of its business.[7]  DSMF ¶ 72; PRDSMF ¶ 72.

### 3.    Packgen's Initial Discussion With BP

By early May 2010, Dan Forte, a marketing consultant for Packgen, called Mario Araya, a BP employee who worked to procure boom for BP.[8]  DSMF ¶¶ 9-10; PRDSMF ¶¶ 9-10; PSAMF ¶ 13; DRPSAMF ¶ 13.  Mr. Forte described Packgen's

---

[5]    Packgen interposed a qualified response to DSMF ¶ 19, contending that "[t]o the extent that Paragraph 19 contends that the entire manufacturing operation was changed, the citation does not support this allegation."  PRDSMF ¶ 19.  The Court has reviewed the record citation and amended DSMF ¶ 19 accordingly.  *See Rule 30(b)(6) Deposition of Packgen*, 205-206 (ECF No. 42-10).

[6]    In accordance with its obligation to view the facts in the light most favorable to Packgen, the Court slightly amended DSMF ¶ 24 based on Packgen's response that the record citation refers to "tests" rather than "a test."  PRDSMF ¶ 24.

[7]    Packgen denied this statement, referring to other portions of Mr. Lapoint's testimony in which he stated that he later changed his mind about the role of boom in Packgen's business. PRDSMF ¶ 72.  Mr. Lapoint's testimony supports DSMF ¶ 72, which is qualified by the phrase "[a]t the time Packgen began manufacturing boom."  The Court rejects Packgen's denial.

[8]    BP "qualified," "admitted for the purpose of summary judgment," and argued that "[t]he citations do not support an 'early May' timeframe."  DRPSAMF ¶ 13.  Although the record citations do not mention early May (or any other date) specifically, the context indicates that the call took place in the immediate aftermath of the oil spill that began on April 20, 2010 and therefore supports Packgen's statement.  The Court deems the statement admitted for purposes of summary judgment.

boom manufacturing capabilities and interest in assisting with the Gulf Coast cleanup; Mr. Araya explained that BP had an urgent need for as much as one thousand miles of boom.[9]  PSAMF ¶ 14; DRPSAMF ¶ 14; DSMF ¶ 20; PRDSMF ¶ 20.  Mr. Araya made an oral commitment to Mr. Forte to purchase all present and future boom that Packgen produced for $21.75 per square foot, subject to a visit by BP personnel to inspect Packgen's facility and to certify Packgen's boom capacity.[10] PSAMF ¶ 15; DRPSAMF ¶ 15; DSMF ¶ 25; PRDSMF ¶ 25.  Given the urgency, Mr. Araya indicated that he would send a person from BP to Maine within one or two days.  PSAMF ¶ 16; DRPSAMF ¶ 16.

### 4.      May 11, 2010: Max Lyoen's Inspection

On May 11, 2010, almost three weeks after the explosion and oil spill, BP's Max Lyoen, a Supplier Quality Control Specialist, inspected Packgen's facility in Auburn, Maine, and met with several individuals, including Dan Forte, John Lapoint, and Don Roberts; Mr. Lyoen had no experience working with or evaluating boom.[11]  PSAMF ¶ 17; DRPSAMF ¶ 17; DSMF ¶ 11; PRDSMF ¶ 11.  At the time of Mr. Lyoen's visit, BP had no specification for boom other than the American Society for Testing and Materials (ASTM) standards; no specification for the decontamination of boom; no specification for the type of fabric required for boom;

---

[9]      BP interposed a qualified response to clarify that BP admits "that *Forte alleges* that Mr. Araya told Mr. Forte BP had an urgent need for boom."  DRPSAMF ¶ 14 (emphasis in original). Given its obligation to view the evidence in the light most favorable to Packgen, the Court deems the statement admitted for purposes of summary judgment.

[10]      BP interposed a qualified response but does not contend that the statement is unsupported by the record.  DRPSAMF ¶ 15.  The Court is obligated to view the evidence in the light most favorable to Packgen and rejects BP's qualification as argument.

[11]      BP interposed a qualified response, seeking to add additional facts about Mr. Lyoen. DRPSAMF ¶ 17.  These additional facts do not contradict anything in Packgen's statement of fact, and the Court disregards them.

and had not performed any field tests on boom.[12]   PSAMF ¶¶ 18-19, 21-23; DRPSAMF ¶¶ 18-19, 21-23.  There are multiple ways to manufacture boom to meet the ASTM standards.  PSAMF ¶ 24; DRPSAMF ¶ 24.  Mr. Lyoen was impressed that Packgen could produce 40,000 to 60,000 feet of boom per day, compared to the 8,000 to 10,000 foot daily output typical of other manufacturers.[13]  PSAMF ¶ 25; DRPSAMF ¶ 25.  Mr. Lyoen stated that the type of end connectors used by Packgen to string boom segments to each other met BP's requirements.[14]  PSAMF ¶ 26; DRPSAMF ¶ 26.  Mr. Lyoen stated that Packgen needed to have its product

---

[12]      BP contends that the record citations regarding BP's specification for boom refer to a June 11, 2010 visit and do not support the stated assertion.  DRPSAMF ¶ 18.  As it is a reasonable inference that generic standards in place in June 2010 were also in place one month earlier, the Court accepts Packgen's statement.  BP also seeks to qualify Packgen's statement that, "[a]s of April and May 2010, BP used only the [ASTM] standards as its own standards for boom."  PSAMF ¶ 23; DRPSAMF ¶ 23.  The Court disregards BP's qualification, which is consistent with Packgen's statement.
      BP denies that Packgen's statement regarding BP's specification for the decontamination of boom is supported by the record citation.  DRPSAMF ¶ 19.  Having reviewed the citations, the Court rejects this contention.  *See McFadden Dep. (Ex. 18)*, 104:20-22 (ECF No. 81-7).
      Packgen also proposed as a statement of material fact that "[a]t the time of Lyoen's visit, BP had no specification or protocol for deploying boom."  PSAMF ¶ 20.  BP denied that this statement is supported by the record citation.  DRPSAMF ¶ 20.  Packgen did not submit to the Court the page of John McFadden's deposition testimony that it cites to support this statement, but BP did, and upon review, the Court agrees with BP.  *See Oral Dep. of John McFadden (June 11, 2012)*, 105:3-7 (ECF No. 98-2).
      BP "admits it had no specification for the type of fabric that was required for boom at the time of Mr. Lyoen's visit," but proceeds to qualify this statement.  DRPSAMF ¶ 21.  The Court disregards the qualification.
      Finally, BP challenges Packgen's statement that "[a]t the time of Lyoen's visit, BP had no field testing requirement or protocol for boom."  PSAMF ¶ 22; DRPSAMF ¶ 22.  Packgen did not submit to the Court the page it cites to support this statement, but BP did, and it reveals that Mr. McFadden testified that he was not aware of any field testing of boom prior to June 2010.  *Oral Dep. of John McFadden (June 11, 2012)*, 106:7-21 (ECF No. 98-2).  Drawing a reasonable inference in Packgen's favor, the Court has amended the statement to indicate that BP had not performed any field tests on boom at the time of Mr. Lyoen's visit.

[13]      BP argues that the record citations are not consistent on this point.  DRPSAMF ¶ 25.  The Court has reviewed the citations, and has slightly altered Packgen's statement but generally accepts it, in accordance with its obligation to view the evidence in the light most favorable to Packgen.

[14]      BP denied this statement, arguing that the record citations do not support it.  DRPSAMF ¶ 26.  Having reviewed the citations, the Court disagrees with BP and accepts the statement.  *See Roberts Dep. (Ex. 15)*, 116:22-117:20 (ECF No. 81-4) ("[Mr. Lyoen] said it would be fine"; "He indicated that . . . it was acceptable").

evaluated by an independent third party for compliance with ASTM standards, although Mr. Lyoen and BP never recommended any approved third parties or suggested any names. PSAMF ¶¶ 27-28; DRPSAMF ¶¶ 27-28. Mr. Lyoen also discussed delivery options with Packgen, including air freight, rail, and road.[15] PSAMF ¶ 29; DRPSAMF ¶ 29. Immediately following his inspection of Packgen's facility, Mr. Lyoen stated to various Packgen representatives, including Messrs. Lapoint, Roberts, and Forte, that BP had a critical need for a thousand miles of boom, and that BP would purchase Packgen's full capacity as soon as Packgen provided third-party testing results showing compliance with ASTM standards and established that its procedures and boom met BP's specifications.[16] PSAMF ¶ 30; DRPSAMF ¶ 30; DSMF ¶¶ 27-29; PRDSMF ¶¶ 27-29. Mr. Lyoen did no further work on boom for BP. PSAMF ¶ 30; DRPSAMF ¶ 30. On May 11, 2010, Mr. Lapoint sent George Kosidowski an email stating:

> We met with a BP representative this afternoon and we should have a response by tomorrow morning on how much they will commit. We have a need for one million ft and we are just waiting on BP to make their decision one way or [an]other.

DSMF ¶ 30; PRDSMF ¶ 30.

### 5. Subsequent Communications

---

[15]    BP interposed a qualified response, denying that Mr. Lyoen discussed delivery options with Packgen. DRPSAMF ¶ 29. BP supported its response with quotes from the record, but these quotes refer to delivery discussions Mr. Lyoen had with Packgen. The Court rejects BP's response and accepts Packgen's statement.

[16]    BP's version is that Mr. Lyoen "recommended" that Packgen undertake certain steps and made no promise that BP would purchase boom from Packgen. DSMF ¶ 27. Packgen interposed a qualified response, denying that Mr. Lyoen made "recommendations," and contending that Mr. Lyoen instead "made promises." PRDSMF ¶ 27. Mr. Lyoen's and Mr. Lapoint's deposition testimony conflicts on this point. In the context of summary judgment, the Court must defer to the non-movant's view of the facts if that view is supported by the record. Accordingly, the Court accepts Packgen's version of what Mr. Lyoen represented to Packgen during his May 11, 2010 visit.

On approximately May 12, 2010, Messrs. Forte and Araya spoke again by phone.  PSAMF ¶ 31; DRPSAMF ¶ 31.  Mr. Araya reiterated BP's need for 1000 miles of boom and reaffirmed BP's commitment to purchase all the boom that Packgen could produce: "I'm placing an order.  We'll take it all."[17]  PSAMF ¶ 31; DRPSAMF ¶ 31.  On May 13, 2010, Mr. Araya told Mr. Forte that he "[didn't] even know [Packgen's] production cost," and negotiated a reduction in the price per square foot to $18.75; he told Mr. Forte that BP would not pay up front.[18]  DSMF ¶ 32; PRDSMF ¶ 32; PSAMF ¶ 32; DRPSAMF ¶ 32; DSMF ¶ 21; PRDSMF ¶ 21.  The same day, Mr. Forte sent an email to Mr. Araya, stating:

> [T]hank you for discussing the details of a possible transaction with Packgen.  We may be able to address the issues concerning payment terms and pricing.
>
> What remains is the issue concerning the acceptability [of] our design and the requirements you have stated.  I believe that there may be an opportunity to move forward and assign a slot on our production schedule for British Petroleum.
>
> All that we require is a letter from Max Lyoen stating that the design meets your requirements.

DSMF ¶ 31; PRDSMF ¶ 31.  No later than May 13, 2010, Packgen informed BP that it was "moving forward" with the sale and delivery.[19]  PSAMF ¶ 33; DRPSAMF ¶ 33.

---

[17]     BP "denies that Mr. Araya verbally committed to purchasing all the boom that Packgen could produce," but for purposes of summary judgment, the Court must accept Packgen's statement since it is supported by the record.  DRPSAMF ¶ 31.

[18]     Packgen raised a hearsay objection to BP's statement that Mr. Araya did not know Packgen's production cost, but gave no further explanation of the grounds for the objection.  PRDSMF ¶ 32.  The Court overrules this objection.

[19]     BP disputes the original statement proposed by Packgen, that "Packgen informed BP that it was 'moving forward' with its obligation under the agreement they reached."  DRPSAMF ¶ 33.  Upon

Based on oral representations made by Messrs. Araya and Lyoen, Packgen began gearing up its operations to produce at least 40,000 linear feet of boom per day.[20]   PSAMF ¶ 34; DRPSAMF ¶ 34.   To meet this demand, Packgen purchased substantial quantities of materials from its suppliers, including 1,500,000 feet of polypropylene material, 1100 pounds of thread, 1,500,000 feet of polypropylene strapping, 50,000 pounds of foam, 250,000 feet of chain, webbing, "hardware" (connectors and accessories), glue, and liner.   PSAMF ¶ 35; DRPSAMF ¶ 35. Packgen also purchased machinery, including a pickup truck and a forklift, to move the materials from its warehouse to its factory.   PSAMF ¶ 36; DRPSAMF ¶ 36. Packgen began modifying its facilities and production line construction and equipment, and hired additional labor to support the increase in production at its facilities.   PSAMF ¶ 37; DRPSAMF ¶ 37.   Prior to the BP oil spill, Packgen did not ordinarily purchase polypropylene, foam, chain, thread, and webbing for its business.[21]   PSAMF ¶ 38; DRPSAMF ¶ 38.   Initially, Packgen planned to use the same type of polypropylene used in its containers, but after speaking with Messrs. Araya and Lyoen, Packgen decided that heavier polypropylene would be better; the heavier polypropylene was a special item rather than a stock item for Packgen's supplier Propex.   PSAMF ¶ 39; DRPSAMF ¶ 39.

---

reviewing the record citations, the Court has slightly amended Packgen's statement to reflect Mr. Forte's testimony.  *See Forte Dep. (Ex. 7)*, 101:13-102:12 (ECF No. 80-7).

[20]      BP "denies that it made any oral representations that committed it to purchasing any amount of Packgen's boom."  DRPSAMF ¶ 34.  The Court disregards this response as argument.

[21]      PSAMF ¶ 38 states that Packgen did not purchase the materials "within the ordinary course of Packgen's business"; BP objected that "[w]ithin the ordinary course" of Packgen's business is a legal conclusion and not a statement of fact.   PSAMF ¶ 38; DRPSAMF ¶ 38.   The Court has rephrased PSAMF ¶ 38 based on BP's objection.

On May 18, 2010, Mr. Forte sent an email to Matt Pavlas, BP's boom sourcing lead, stating:

> [T]hank you for your time assisting us today. www.packgen.com is a recognized leader in the manufacturing of 'oil containment boom,' they are attempting sales to BP and Oil Cleanup companies. BP Quality Assurance Officer Max Lyoen visited the Packgen facility last week and wrote a report about Packgen and their boom products for BP. Please provide indications if this report meets BP requirements. Also, Packgen would appreciate any opportunity to sell DIRECTLY to BP. They have boom in inventory and ready to ship!

DSMF ¶ 34; PRDSMF ¶ 34. BP provided Packgen with a copy of Mr. Lyoen's report on or about May 19, 2010.[22] DSMF ¶ 35; PRDSMF ¶ 35. The report described the product as "experimental" and stated, "No industrial size delivery performed at this time. Design is new." DSMF ¶ 37; PRDSMF ¶ 37. The report also stated that the product was not being manufactured at the time of the audit other than the one experimental line. *Id.*

Packgen hired Ian T. Durham, Ph.D., to conduct third party testing. DSMF ¶ 38; PRDSMF ¶ 38. In a report dated May 20, 2010, Dr. Durham stated that Packgen's boom met ASTM standards. *Id.* On May 21, 2010, Packgen provided Mr. Lyoen and two BP procurement managers with third-party testing results, which verified that Packgen's boom met or exceeded all ASTM and United States Coast Guard standards and the additional tensile strength requirement BP provided. PSAMF ¶ 42; DRPSAMF ¶ 42.

---

[22]   The Court has excluded DSMF ¶ 36, which states that "[t]he inspection report cited issues that needed to be resolved, including lack of certification of underlying materials, testing records, and actual production." DSMF ¶ 36. Packgen interposed a qualified response, asserting that nothing in the record citation "communicate[d] to Packgen that anything ha[d] to be resolved." PRDSMF ¶ 36. Having reviewed the report in the light most favorable to Packgen, the Court concludes that the report does not state that there were "issues that needed to be resolved" and excludes DSMF ¶ 36 as unsupported by the record.

As of May 21, 2010, Mr. Pavlas was under pressure from the Unified Area Command Center for more boom.[23]  PSAMF ¶ 43; DRPSAMF ¶ 43.  Prior to the Gulf Spill, Mr. Pavlas had no employment experience working with boom.[24]  PSAMF ¶ 44; DRPSAMF ¶ 44.

On Saturday, May 22, 2010, Mr. Roberts sent Mr. Pavlas the following email:

> I just wanted to find out if you heard any word back from your technical review.  I hope the information from the third party review helps in the decision making process.  We are hard at work making boom and production is hitting the levels we had anticipated.

DSMF ¶ 39; PRDSMF ¶ 39; PSAMF ¶ 45; DRPSAMF ¶ 45.[25]  On Sunday, May 23, 2010, Mr. Pavlas contacted Mr. Roberts by phone to inquire about the availability of Packgen's boom.[26]  PSAMF ¶ 46; DRPSAMF ¶ 46.  Mr. Pavlas stated that BP intended to purchase Packgen's entire stock of boom, and would immediately purchase Packgen's current inventory of 42,000 linear feet of boom.[27]  PSAMF ¶ 47; DRPSAMF ¶ 47.  Mr. Pavlas does "not recall what [they] talked about, if there was a conversation."[28]  PSAMF ¶ 48; DRPSAMF ¶ 48.

---

[23]     BP interposed a qualified response, noting that Mr. Pavlas was the containment boom sourcing lead "as of early May 2010" and that he testified that "the source of the pressure for more boom was 'probably communication for more supply of boom from the UAC Center.'"  DRPSAMF ¶ 43.  Since the Court must view the evidence in the light most favorable to Packgen, Mr. Pavlas's testimony is sufficient to sustain the statement as Packgen has proposed it, and the Court disregards BP's qualification.

[24]     The Court deems the statement admitted for purposes of summary judgment.  DRPSAMF ¶ 44. Additional facts belong in a statement of material facts.

[25]     The Court deems the statement admitted for purposes of summary judgment.  DRPSAMF ¶ 45. Additional facts belong in a statement of material facts.

[26]     The Court deems the statement admitted for purposes of summary judgment.  DRPSAMF ¶ 46.

[27]     The Court deems the statement admitted for purposes of summary judgment.  DRPSAMF ¶ 47. Additional facts belong in a statement of material facts.

[28]     The Court deems the statement admitted for purposes of summary judgment.  DRPSAMF ¶ 48. Additional facts belong in a statement of material facts.

On May 24, 2010, Mr. Roberts sent Mr. Pavlas an email stating, "I spoke with the owner of our company this morning in reference to our conversation last evening. He asked if I would reach out to you to schedule a conference call with the three of us to discuss possible working relationship." DSMF ¶ 40; PRDSMF ¶ 40. Mr. Pavlas responded, "I appreciate the request but first I would like to receive the information requested yesterday such as qty in inventory, etc." DSMF ¶ 41; PRDSMF ¶ 41. On May 24, 2010, Mr. Roberts offered pricing terms for a trial order of 42,000 feet of boom. DSMF ¶ 42; PRDSMF ¶ 42.

On May 26, 2010, Deenan Arcot told Mr. Roberts, in an email requesting the specifications for Packgen's boom—which would need to be approved prior to an order—that BP could not give "quantum order like Blanket PO" but that they could have "weekly basis order quantity depending on your production capacity per week. Week by week orders." DSMF ¶¶ 43-44; PRDSMF ¶¶ 43-44. Mr. Roberts believed Mr. Arcot's email meant that boom was going to different geographical locations, not that Mr. Arcot was limiting the amount of boom that BP was purchasing from Packgen. PSAMF ¶ 126; DRPSAMF ¶ 126. After receiving the specifications from Packgen on May 26, 2010, Mr. Arcot sent Packgen an email:

> Very different construction from others being used. One big question is % elongation of the polypropylene tension cord? This is not listed on the specification. This all reads like this is a NEW design and I do question whether we should be doing production introduction at this time.[29]

DSMF ¶ 45; PRDSMF ¶ 45. The same day, Mr. Arcot sent Packgen another email:

---

[29] Packgen interposed a qualified response, but does not dispute that Mr. Arcot sent the email described in DSMF ¶ 45. The Court accepts BP's statement.

> I understand that your spec is new to our field and it will be a weakest link in our field operations. I do not want that to happen. If at all I have [to] order a small quantity (indicate the smallest order quantity in your reply for the tr[ia]l order). Then you should be prepared to accept the returns if the Boom fails to meet our requirements at the field test. Please confirm understanding. . . . I want to check the possibility that you can modify these booms to our standard requirement.

DSMF ¶¶ 47-48; PRDSMF ¶¶ 47-48. Referring to an email from BP to Packgen sent in late May 2010, Mr. Roberts testified, "This was the first time that any type of . . . resemblance of a spec. was issued. . . . They didn't even understand what the specs. were. They were being taught as I informed them. . . . They didn't have any definition to a boom. They were making it up as they went along."[30] PSAMF ¶ 120; DRPSAMF ¶ 120.

### 6.   May 26, 2010: The End Connector Dispute

As of May 26, 2010, Packgen believed that BP would purchase its entire boom manufacturing capacity and inventory.[31] PSAMF ¶ 49; DRPSAMF ¶ 49. On May 26, 2010, BP noted potential problems with the connector plates used by Packgen on its oil containment boom, as well as potential corrosion and interconnectivity issues with Packgen's end connectors, and sent Packgen an email stating there was a "definite CANNOT USE, on this product at this time." DSMF ¶¶ 49-50; PRDSMF ¶¶ 49-50. Packgen first learned from BP on May 26, 2010, that BP would not purchase Packgen's boom until Packgen obtained new end connectors for its boom,

---

[30]   Packgen proposed in PSAMF ¶ 121 the statement, "BP employee McFadden admitted as much when he testified that BP learned its lessons on boom manufacture and construction from evaluating companies' boom, including Packgen." PSAMF ¶ 121. BP denied the statement, noting that it was unsupported by any record citation. DRPSAMF ¶ 121. Given the lack of a record citation, the Court has not included PSAMF ¶ 121 in its recitation of the facts.

[31]   BP interposed a qualified response, proposing additional facts. DRPSAMF ¶ 49. Additional facts belong in a statement of material facts.

contradicting Mr. Lyoen's earlier representation.[32]  PSAMF ¶ 50; DRPSAMF ¶ 50.

Although Mr. Lyoen had approved Packgen's end connectors during his visit to

Packgen on May 11, BP's Charles Bigi expressed concerns about the connectors'

interconnectivity and possible corrosion.[33]  PSAMF ¶ 51; DRPSAMF ¶ 51.  Mr. Bigi

had only limited experience with boom.[34]  PSAMF ¶ 52; DRPSAMF ¶ 52.  On May

26, 2010, Messrs. Lapoint and Roberts spoke with Mr. Bigi about the end connector

issue; when Mr. Lapoint expressed frustration that Mr. Bigi was adding to the

terms of the existing agreement, Mr. Bigi responded, "If you keep that attitude, I

can guarantee you won't sell one foot of boom."[35]  PSAMF ¶ 53; DRPSAMF ¶ 53.

After Mr. Lapoint expressed a desire to work with Mr. Bigi on this issue, Mr. Bigi

promised that as soon as Packgen obtained the new universal connectors, BP would

approve and then buy Packgen's boom.[36]  PSAMF ¶ 54; DRPSAMF ¶ 54.  BP knew

---

[32]    In its response, BP "denies that it made any oral or written commitments to purchase Packgen's boom" and asserts that "the correspondence from BP speaks for itself," but does not argue that Packgen's statement is unsupported by the record citations.  DRPSAMF ¶ 50.  In accordance with its obligation to view the evidence in the light most favorable to Packgen, the Court accepts Packgen's statement.

[33]    BP interposed a qualified response, arguing that "Packgen's own testimony is inconsistent" on whether Mr. Lyoen approved the connectors.  DRPSAMF ¶ 51.  In accordance with its obligation to view the facts in the light most favorable to Packgen, the Court accepts Packgen's statement.

[34]    BP interposed a qualified response, proposing more specific facts regarding Mr. Bigi's experience with boom.  DRPSAMF ¶ 52.  As BP does not contend that Packgen's statement is unsupported by the record, the Court accepts Packgen's statement.

[35]    BP interposed a qualified response, emphasizing that the conversation "did not reflect an acknowledgement by Mr. Bigi that an agreement existed between BP and Packgen."  DRPSAMF ¶ 53.  As BP does not contend that Packgen's statement is unsupported by the record, the Court accepts Packgen's statement.

[36]    BP denied Packgen's statement, contending that Mr. Bigi's statement, "if you get the 2010 slide gate connector, you will be approved, and we are expecting to purchase," "does not reflect a promise."  DRPSAMF ¶ 54.  While the Court is skeptical of BP's assertion that the quote in question "does not reflect a promise," Packgen's statement is also supported by Mr. Roberts' testimony that Mr. Bigi "said, look, you go out and get the corrosive resistant universal slide connector, and we'll buy your capacity, and we're going to go forward with you.  Then we made the next step, he made the next promise."  *Roberts Dep. (Ex. 15)*, 173:17-25 (ECF No. 81-4).  Viewing the evidence in the light most favorable to Packgen, the Court accepts Packgen's statement.

that Packgen then worked to retrofit its boom with the universal connectors. *Id.*
On May 28, 2010, BP told Packgen that its boom "failed [BP's] quality test." DSMF
¶ 51; PRDSMF ¶ 51.

### 7.    Subsequent Communications and Actions

On May 29, 2010, Mr. Bigi sent Mr. Lyoen and Brian Miller an email
containing a brief description of his discussions with Packgen and the statement, "I
do not understand why we keep placing orders with suppliers like this?"[37]   PSAMF
¶ 55; DRPSAMF ¶ 55; PSAMF ¶ 117; DRPSAMF ¶ 117.   In an email dated June 6,
2010, Mr. Bigi again expressed frustration and disbelief regarding BP's placement
of orders with new boom manufacturers.[38]   PSAMF ¶ 118; DRPSAMF ¶ 118.   In
response to Mark Ploen's email expressing a concern that "large orders had been

---

[37]     Packgen cited this email as support for the statement, "BP also knew that it had placed
orders for boom with Packgen." PSAMF ¶ 55.  BP contends that this email "does not reflect an
acknowledgement by Mr. Bigi of an order with Packgen, but instead reflects Mr. Bigi's general
frustration with BP placing orders with suppliers who, like Packgen, did not meet BP specifications."
DRPSAMF ¶ 55.  The Court resolves this dispute by substituting Mr. Bigi's statement for Packgen's
interpretation.
         BP also makes a hearsay objection, arguing that "[g]iven the position of Mr. Bigi, his
knowledge and the context of the email and the deposition Mr. Bigi's e-mail is not admissible as an
admission of BP pursuant to [FED. R. EVID.] 801(d)(2)." DRPSAMF ¶ 55.  The Court overrules this
objection, as—assuming it would otherwise be hearsay—Mr. Bigi's email fits within Rule
801(d)(2)(D), which provides that a statement is not hearsay if it "is offered against an opposing
party and was made by the party's agent or employee on a matter within the scope of that
relationship and while it existed." FED. R. EVID. 801(d)(2)(D).
         In PSAMF ¶ 117, Packgen asserts that Mr. Bigi's email "is an admission by BP that BP had
agreed to purchase Packgen's boom." PSAMF ¶ 117.  To the extent Packgen intends a legal
conclusion under the statute of frauds, the Court considers the statement argument rather than a
statement of material fact.
[38]     In its response to PSAMF ¶ 118, BP violates the Local Rules by not stating whether it
admits, qualifies, or denies the statement.  DRPSAMF ¶ 118; D. ME. LOC. R. 56(c) ("Each [opposing]
statement shall begin with the designation 'Admitted,' 'Denied,' or 'Qualified' . . .").  As BP does not
argue that the statement is unsupported by the record, the Court deems the statement admitted for
purposes of summary judgment.

placed with companies unheard of in the industry 46 days ago," Mr. Bigi stated, "Been singing the same song."[39] *Id.*

In late May or early June, Packgen secured universal slide connectors from Pierce Aluminum. PSAMF ¶ 56; DRPSAMF ¶ 56. As of June 3, 2010, BP's demand for boom continued to increase. PSAMF ¶ 58; DRPSAMF ¶ 58. By June 4, 2010, BP began to organize a second visit to Packgen's facility because Packgen had obtained the new connectors. PSAMF ¶ 57; DRPSAMF ¶ 57. BP began to institute a new approval process for boom manufacturers.[40] PSAMF ¶ 59; DRPSAMF ¶ 59.

At some point, BP hired technical authorities on boom.[41] PSAMF ¶ 60; DRPSAMF ¶ 60. One of BP's boom technical authorities was Leo Guidroz, who helped BP assess Packgen and other boom manufacturers. PSAMF ¶ 61; DRPSAMF ¶ 61. Mr. Guidroz worked for a boom company that sold 15,000 feet of boom to BP, rented 40,000 feet of inland boom to BP at a daily cost of $60,000 if it was all deployed, and rented 155,000 feet of inflatable boom to BP at a daily cost of $930,000 if it was all deployed, and a daily standby rate of $465,000 if none of the boom was deployed. PSAMF ¶ 62; DRPSAMF ¶ 62. Unlike Packgen, the boom company that Mr. Guidroz worked for could produce only 6,000 to 7,000 feet of boom

---

[39]      Packgen proposed in PSAMF ¶ 119 the statement, "Here, a purchase order was referred to as a 'mere formality.'" PSAMF ¶ 119. This statement is unsupported by a citation. Although BP "admits that Packgen has testified to that effect," DRPSAMF ¶ 119, the Court has not included the statement because its lack of context and use of the passive voice render it meaningless.

[40]      PSAMF ¶ 59 also states that "BP did not communicate this process to Packgen." PSAMF ¶ 59. BP denied this statement, contending that Mr. Pavlas stated in his deposition only that he "could not recall" whether the new process was communicated to new suppliers. DRPSAMF ¶ 59. Having reviewed Packgen's record citations, the Court concludes that these citations do not support a reasonable inference that BP did not communicate the new process to Packgen.

[41]      BP interposed a qualified response, arguing that "[a]t the time of the deposition, BP did not know" when these individuals were hired; at the same time, BP "admits solely for the purposes of summary judgment." DRPSAMF ¶ 60. The Court deems the whole statement admitted for the purposes of summary judgment.

per day.  PSAMF ¶ 63; DRPSAMF ¶ 63.  Mr. Guidroz received a bonus of $75,000

for his work with BP in 2010 in addition to his $77,000 salary.  PSAMF ¶ 64;

DRPSAMF ¶ 64.

### 8.   June 11, 2010: Luis Suarez's Inspection

On June 11, 2010, BP sent Luis Suarez, a Supplier Quality Control

Specialist, to conduct a quality assessment of Packgen's manufacturing processes,

including its "quality management system, production capacity and the product

conformance with BP requirements and applicable industry standards."  DSMF ¶

52; PRDSMF ¶ 52; PSAMF ¶ 65; DRPSAMF ¶ 65.  Mr. Suarez visited Packgen's

facility, watched boom production, and viewed a nearby warehouse containing

Packgen's boom inventory.[42]  PSAMF ¶ 65; DRPSAMF ¶ 65.  Mr. Suarez, who was

hired by BP on May 24, 2010, had neither educational background nor training in

boom.[43]  PSAMF ¶ 66; DRPSAMF ¶ 66.  Mr. Suarez did not speak with or consult

any of the new BP technical authorities for boom prior to visiting Packgen.[44]

PSAMF ¶ 67; DRPSAMF ¶ 67.  At the time of Mr. Suarez's visit, BP had no written

---

[42]    BP interposed a qualified response, stating that, "[d]uring his visit, Mr. Suarez observed a prototype run that was meant to demonstrate Packgen's production system in operation." DRPSAMF ¶ 65.  BP's slightly different account of Mr. Suarez's visit seems consistent with Packgen's statement and BP does not argue that Packgen's account is unsupported by the record. The Court accepts Packgen's statement.

[43]    The Court deems the statement admitted for purposes of summary judgment.  DRPSAMF ¶ 66. Additional facts belong in a statement of material facts.

[44]    BP denied this statement, contending that the record citation does not support it. DRPSAMF ¶ 67.  The record citation is to Mr. Suarez's deposition testimony, in which he answered "I don't think so" to the question "[p]rior to your visit to Packgen on June 11th, 2010, were you aware of any technical authorities for oil containment boom?"  *Suarez Dep. (Ex. 19)*, 95:14-17 (ECF No. 81-8).  Mr. Suarez's testimony, if not absolutely definitive, supports Packgen's statement for purposes of summary judgment.  The Court accepts Packgen's statement.

specification for boom other than the ASTM requirements.[45]   PSAMF ¶ 68; DRPSAMF ¶ 68.  During Mr. Suarez's visit, Packgen provided Mr. Suarez with a revised copy of the third-party assessment showing that Packgen's boom met the ASTM standards and contained the new connectors.[46]  PSAMF ¶ 69; DRPSAMF ¶ 69.  Based on his visit, Mr. Suarez believed Packgen could produce at least 40,000 feet of boom per day, much more than the average capacity of other producers.[47] PSAMF ¶ 70; DRPSAMF ¶ 70.  Following the second audit, Mr. Suarez told Messrs. Lapoint and Roberts that BP still had a need for 1.5 million feet of boom and that BP would purchase Packgen's capacity; Mr. Suarez also stated that Packgen would be "busy for a long time."[48]  PSAMF ¶ 71; DRPSAMF ¶ 71; DSMF ¶ 53; PRDSMF ¶ 53.

### 9.   The Development of BP's Specification

After his visit to Packgen, Mr. Suarez told Mr. Bigi that he believed that Packgen's boom manufacturing capacity could reach as high as 100,000 feet per

---

[45]     BP interposed a qualified response, noting that Mr. Suarez was using the ASTM standards at the time of his visit.  DRPSAMF ¶ 68.  In his testimony, Mr. Suarez stated that he did not think he had been given BP's boom specifications prior to his June 11, 2010 visit to Packgen, but stated that "[w]hat I recall from that time is the -- as far as ASTM, the connectors have to meet certain ASTM requirements."  *Suarez Dep. (Ex. 19)*, 68:3-69:2 (ECF No. 81-8).  As originally worded, Packgen's statement indicated that BP had no written specification.  The Court has amended the statement to clarify that, based on Mr. Suarez's testimony, BP had no written specification other than the ASTM requirements.

[46]     BP responded "[q]ualify," but admitted a nearly identical statement with insignificant wording changes.  DRPSAMF ¶ 69.  The Court deems the statement admitted for purposes of summary judgment.

[47]     BP denied that the record citation supports the contention that Mr. Suarez's belief about Packgen's capacity was communicated to Packgen.  DRPSAMF ¶ 70.  Having reviewed the record citations, the Court has amended Packgen's statement to reflect Mr. Suarez's testimony.

[48]     BP interposed a qualified response, contending that "[t]hese statements represent *Mr. Lapoint's recollection* of communications with Mr. Suarez."  DRPSAMF ¶ 71.  For purposes of summary judgment, Mr. Lapoint's sworn recollection suffices to establish the fact, and the Court accepts Packgen's statement.

week with two shifts.[49]   PSAMF ¶ 72; DRPSAMF ¶ 72.   He also told Mr. Bigi that Packgen had approximately 50,000 feet of boom in inventory.[50]   PSAMF ¶ 73; DRPSAMF ¶ 73.

On June 15, 2010, Mr. Suarez requested that Packgen send 500-600 feet of its boom for evaluation by BP.   DSMF ¶ 54; PRDSMF ¶ 54.   Mr. Suarez issued a report regarding Packgen's boom on June 16, 2010, in which he proposed three new modifications that he had not discussed with Packgen in Maine.[51]   *Id.*

As of June 14, 2010, BP was developing a written draft specification for 18" boom, but the specification was kept internal at that time.[52]   PSAMF ¶ 74; DRPSAMF ¶ 74; DSMF ¶ 33; PRDSMF ¶ 33.   The specification evolved, and by June 18, 2010, BP completed a revised written specification; BP employee John McFadden testified that "BP lessons learned" led to the 18" specification.   PSAMF ¶ 75; DRPSAMF ¶ 75.   Boom manufacturers like Packgen were not told that BP was creating a new specification.[53]   PSAMF ¶ 76; DRPSAMF ¶ 76.   At some point after

---

[49]      The Court deems the statement admitted for purposes of summary judgment.   DRPSAMF ¶ 72. Additional facts belong in a statement of material facts.

[50]      The Court deems the statement admitted for purposes of summary judgment.   DRPSAMF ¶ 73. Additional facts belong in a statement of material facts.

[51]      BP interposed a qualified response, stating that Mr. Suarez "could only specifically recall whether he discussed the three proposed modifications [with] Packgen during his visit on June 11, 2010." DRPSAMF ¶ 73. This qualification does not contradict Packgen's statement, which the Court accepts.

[52]      PSAMF ¶ 74 states that "BP developed its first written draft specification for 18" boom on June 14, 2010, but the specification was kept internal by BP and from boom manufacturers." PSAMF ¶ 74.   BP interposed a qualified response, contending that "[p]rior to June 14, 2010, Mr. McFadden and his team were doing the work to develop specifications for 18" boom." DRPSAMF ¶ 74. The Court reviewed the cited portions of Mr. McFadden's testimony and found no support for the statement that BP developed its "first" specification on June 14, 2010. The Court has amended the statement to reflect the cited portions of Mr. McFadden's testimony.

[53]      BP denied the statement, contending that it is unsupported by the record citation. DRPSAMF ¶ 76.   The Court reviewed the record citations and concludes that the statement is supported by Charles Bigi's Rule 30(b)(6) testimony.   *See Bigi 30(b)(6) Dep. (Ex. 5)*, 73:10-25 (ECF No. 80-5).

BP created a specification, it began requesting that boom manufacturers complete a deviation form if their boom differed from the specification.   PSAMF ¶ 77; DRPSAMF ¶ 77.   Packgen's boom design was so different from BP's specification that Packgen agreed to submit a drawing of its boom instead of the ordinary deviation form.[54]  DSMF ¶ 46; PRDSMF ¶ 46; PSAMF ¶ 78; DRPSAMF ¶ 78.

On June 21, 2010, Mr. Suarez reiterated his request that Packgen ship "6 x 100 ft" to the Patriot Staging Yard # 3 for a field test.[55]  DSMF ¶ 55; PRDSMF ¶ 55. Packgen's boom design differed from the specifications provided by BP in June 2010, which was one of the reasons BP required a field test.[56]   DSMF ¶ 56; PRDSMF ¶ 56.  Between June 16 and June 26, 2010, BP made a number of new requests for Packgen's boom.[57]  PSAMF ¶ 79; DRPSAMF ¶ 79.  BP requested that Packgen: (1) relocate the top tension strap; (2) add an air purge perforation; (3) find a means to hold the chain at the bottom; (4) address a concern regarding volume

---

[54]     PSAMF ¶ 78 states that "Packgen, however, was never required to complete a deviation form."  PSAMF ¶ 78.  BP interposed a qualified response, noting that Packgen had agreed to submit a separate drawing instead.  DRPSAMF ¶ 78.  Having reviewed Packgen's record citation, the Court concludes that Packgen's statement is somewhat misleading, and has amended the statement to reflect the fact that, according to the record citation, Packgen agreed to submit a drawing in lieu of the ordinary deviation form.

[55]     In DSMF ¶ 55, BP also states that "Packgen provided this sample without an expectation of payment."  Packgen interposed a qualified response, contending that this portion of the statement is unsupported by the record citation.  PRDSMF ¶ 55.  After reviewing the record citation, the Court agrees with Packgen and has excluded this portion of DSMF ¶ 55.

[56]     DSMF ¶ 56 states that Packgen's boom design differed "significantly" from BP's specifications.  DSMF ¶ 56.  Packgen interposed a qualified response, contending that the record citation does not support the characterization of the differences as "significant."  PRDSMF ¶ 56. After reviewing the record citation, the Court agrees with Packgen and has excluded the word "significantly" from the statement of fact.

[57]     PSAMF ¶ 79 begins with the statement, "Despite BP's repeated promises and representations to buy Packgen's capacity, and Packgen's satisfaction of all the stated requirements, BP saddled Packgen with additional requests for Packgen's boom."  PSAMF ¶ 79.  BP denied this statement, noting that it is not supported by the record citations.  DRPSAMF ¶ 79.  Packgen provided no record citations to support this statement, and the Court has omitted it as argument.

BP seeks to qualify the rest of PSAMF ¶ 79 by proposing additional facts.  Additional facts belong in a statement of material facts.

between the flotation pockets; (5) address a concern about the oil absorption characteristics of the boom fabric; (6) address a concern about the freeboard height; and (7) place a stainless steel tag on each section of boom that contained Packgen's name, the lot number, and the date of manufacture. *Id.* None of these proposed changes was required by the ASTM standards. PSAMF ¶ 80; DRPSAMF ¶ 80. Packgen continued to work at BP's direction to provide requested information and to make minor technical changes to its boom.[58] PSAMF ¶ 81; DRPSAMF ¶ 81.

At this same time, the Houston Boom Team began creating a "mitigation emergency plan" that included "the expansion of domestic and international [boom] production," because of the upcoming hurricane season and the risk that a hurricane could severely damage the boom that was deployed. PSAMF ¶ 82; DRPSAMF ¶ 82.

### 10.    June 30, 2010: First Field Test

BP conducted its first field test of Packgen's boom on June 30, 2010, at a BP logistics site near Mobile, Alabama.[59] PSAMF ¶ 83; DRPSAMF ¶ 83. According to Mr. Guidroz, a captain of one of the boats in the field test, Packgen's boom

---

[58]    BP noted that Packgen cited no evidence to support PSAMF ¶ 81; however, BP admitted "that Packgen told BP that it made changes to its boom design based on the issues raised by BP." DRPSAMF ¶ 81.

[59]    PSAMF ¶ 84 states that "BP did not develop a field testing requirement for boom until sometime in June" and that "[a]t the time of the field test, BP had neither a formal field testing protocol nor a decontamination protocol for boom." PSAMF ¶ 84. BP interposed a qualified response, questioning the extent to which these statements are supported by the record citations and proposing additional facts. DRPSAMF ¶ 84. Having reviewed the record citations, the Court concludes that the only portion of the statement that is supported by the evidence is that BP did not have a decontamination procedure at the time of the June 30, 2010 field test; this statement is included later in the Court's recitation of the facts.

performed well at the field test.[60]   PSAMF ¶ 88; DRPSAMF ¶ 88.   However, Packgen's Jim Colony stated to Mr. Lapoint and others at Packgen that the "bottom line is our boom failed to perform" at the field test.  DSMF ¶ 58; PRDSMF ¶ 58.

While in Alabama, Mr. Roberts spoke with Mr. Bigi, who explained that BP had recently taken control of the procurement process for all boom from the contracted environmental companies, and confirmed that BP needed more than 1,500,000 feet of boom in the near future.[61]  PSAMF ¶ 85; DRPSAMF ¶ 85.  Mr. Bigi also stated that BP needed 24" boom and that, if Packgen could adapt its manufacturing process to produce 24" boom, Packgen would be BP's supplier for that boom.[62]  PSAMF ¶ 86; DRPSAMF ¶ 86.  Mr. Bigi has testified under oath that he does not remember the specifics of the conversation.[63]  PSAMF ¶ 87; DRPSAMF ¶ 87.

### 11.   Two New Concerns

Following the field test, BP raised two new concerns regarding Packgen's boom.   PSAMF ¶ 89; DRPSAMF ¶ 89.   First, because Packgen's boom was

---

[60]    BP denied this statement, contending that it is unsupported by the cited testimony and asserting that "Packgen has already admitted to the contrary."  DRPSAMF ¶ 88.  In the record citation, Mr. Roberts testified that Mr. Guidroz was the captain of one of the boats in the field test and said, "[T]his is good stuff.  We've got to get it out in the tidal water.  It stands up perfect.  It doesn't get blown around."  *Roberts Dep. (Ex. 15)*, 161:6-13 (ECF No. 81-4).  The Court concludes that Packgen's statement is supported by the record citation.  However, the Court has qualified the statement to clarify that this was Mr. Guidroz's opinion.

[61]    BP denied that this is a material fact and admitted "that *Mr. Roberts testified*" about the statements in question.  DRPSAMF ¶ 85.  The Court deems the statement admitted for purposes of summary judgment.

[62]    BP interposed a qualified response, admitting that "*Mr. Roberts testified*" to the facts in the statement.  DRPSAMF ¶ 86.  The Court deems the statement admitted for purposes of summary judgment.

[63]    As submitted, PSAMF ¶ 87 was missing a "not," which the Court has added.  BP interposed a qualified response, proposing additional facts.  DRPSAMF ¶ 87.  Additional facts belong in a statement of material facts.

constructed with a fold of polypropylene material, the boom filled with water while being towed for deployment by boats; BP was concerned that Packgen's boom would therefore be too heavy for small boats to tow. PSAMF ¶ 89; DRPSAMF ¶ 89; DSMF ¶ 57; PRDSMF ¶ 57. The boat captains, however, thought that the extra water made the boom more stable, and allowed it to perform better than traditional boom in rough water.[64]  *Id.*

Second, on July 7, 2010, BP indicated that Packgen's boom did not meet its decontamination standards; however, BP had no decontamination procedure of its own at this time and was unaware of the procedure used by its subcontractor, Patriot Environmental Services (Patriot).[65]  DSMF ¶ 59; PRDSMF ¶ 59; PSAMF ¶ 90; DRPSAMF ¶ 90; PSAMF ¶ 84; DRPSAMF ¶ 84.

Packgen contacted Patriot directly to understand the decontamination process and modify the boom design accordingly. PSAMF ¶ 90; DRPSAMF ¶ 90. Packgen learned that Patriot's decontamination technique of placing a power washer nozzle two inches away from the boom was responsible for damage to Packgen's boom. PSAMF ¶ 91; DRPSAMF ¶ 91. Packgen immediately worked to

---

[64]     BP raises a hearsay objection to this statement. DRPSAMF ¶ 89. Packgen responds that the statements are in a BP report and therefore admissible as a business record under FED. R. EVID. 803(6); that the boat captains were acting as BP's agents, so that the statements are admissible under FED. R. EVID. 801(d)(2); and that the statements are not hearsay because they are being offered for their effect on the listeners, BP and Packgen. *Pl.'s 56(e) Sur-Reply* ¶ 89. Although it is difficult to evaluate a hearsay objection without the context of trial, the Court concludes that the statements would likely be admissible and overrules the objection.

[65]     BP interposed a qualified response, disputing the extent to which the statements contained in PSAMF ¶ 90 are supported by the record citations and proposing additional facts. DRPSAMF ¶ 90. The Court found no support in the record citation for Packgen's statement that "decontamination is not discussed in the ASTM standards," and has not included this portion of DRPSAMF ¶ 90.

address the two new issues raised at the June 30, 2010 field test.  PSAMF ¶ 91;

DRPSAMF ¶ 91; DSMF ¶ 60; PRDSMF ¶ 60.

### 12.   Early July 2010: BP Secures Boom from Other Sources

As of July 6, 2010, BP knew that 90% of the qualified domestic boom

production was committed to BP.  PSAMF ¶ 129; DRPSAMF ¶ 129.  As of July 7,

2010, BP needed one million linear feet of 18" boom for the Incident Command

Posts (ICPs) by August 7, 2010, and 500,000 to 750,000 feet of boom for the

"hurricane warehouse" in Memphis, Tennessee.  PSAMF ¶ 130; DRPSAMF ¶ 130.

As of July 7, 2010, the average daily supply of new boom to BP was 30,000 linear

feet.[66]  PSAMF ¶ 131; DRPSAMF ¶ 131.  BP was demanding additional boom "to

support the boom demand for replacement of damaged boom, hurricane

preparedness, and upcoming projects," amounting to one million linear feet to be

delivered by August 7, 2010.  PSAMF ¶ 132; DRPSAMF ¶ 132.  To support BP's

continued need for boom as of July 8, 2010, BP was extending contracts with

current manufacturers and executing new contracts with recently qualified

manufacturers.  PSAMF ¶ 133; DRPSAMF ¶ 133.  As part of its *Deepwater Horizon*

response effort, BP directly purchased 2,049,920 feet of Inland containment Boom

from 26 different manufacturers.[67]  DSMF ¶ 73; PRDSMF ¶ 73.

### 13.   Discussions Regarding 24" Boom

---

[66]   BP interposed a qualified response, noting that "the actual quote of the document is, 'The current average daily supply is around 30,000ft.'"  DRPSAMF ¶ 131.  Seeing no significant difference between Packgen's version of the quote and the actual quote, the Court has accepted Packgen's version.

[67]   Packgen objected to this statement on hearsay grounds, arguing that "[t]he interrogatories of BP are hearsay and cannot be used affirmatively by BP."  PRDSMF ¶ 73.  Although the interrogatories themselves cannot be introduced at trial, the Court assumes that BP would be able to produce a live witness to testify to this fact and overrules the objection.

On July 7, 2010, Mr. Suarez forwarded the latest specification for 24" boom to Packgen.[68]  PSAMF ¶ 92; DRPSAMF ¶ 92.  On July 13, Mr. McFadden reiterated BP's desire for Packgen to produce 24" boom: "Please work on getting the material to make 24" boom."[69]  PSAMF ¶ 93; DRPSAMF ¶ 93; DSMF ¶ 62; PRDSMF ¶ 62.  At BP's direction, Packgen completed a field water test of the newly-configured boom on July 12, 2010, and forwarded a video tape of the test to BP.  PSAMF ¶ 94; DRPSAMF ¶ 94; DSMF ¶ 61; PRDSMF ¶ 61.

On July 12, 2010, internal BP communications demonstrate that BP needed 1.7 million feet of boom.[70]  PSAMF ¶ 95; DRPSAMF ¶ 95.  BP believed that Packgen's ability to manufacture between 35,000 and 60,000 feet of boom per day would assist in addressing BP's need for boom.  PSAMF ¶ 96; DRPSAMF ¶ 96.

### 14.   July 15, 2010: The Well Is Capped

The *Deepwater Horizon* well was capped on July 15, 2010.  DSMF ¶ 63; PRDSMF ¶ 63.  By July 20, 2010, a day before BP's second field test of Packgen's boom, BP began trying to wind down its boom purchases.  PSAMF ¶ 134; DRPSAMF ¶ 134.  BP's Critical Resources Unit Leader, Lou Weltzer, began

---

[68]    BP interposed a qualified response, but at the same time admitted the statement solely for purposes of summary judgment.  DRPSAMF ¶ 92.  The Court deems the statement admitted for purposes of summary judgment.

[69]    BP interposed a qualified response, contending that the record citation does not support the assertion that Mr. McFadden reiterated BP's desire "for Packgen to modify its manufacturing process."  DRPSAMF ¶ 93.  Having reviewed the record citations, the Court agrees that they do not refer specifically to modifications to Packgen's manufacturing process, and has omitted this portion of the statement.

[70]    BP interposed a qualified response, arguing that the cited testimony "makes assumptions."  DRPSAMF ¶ 95.  In accordance with its obligation to view the facts in the light most favorable to Packgen, the Court accepts Packgen's statement as reasonably supported by the record citations.

working with BP's procurement group and the ICPs to see how many contracts could be severed early to save money.  *Id.*

### 15.    July 21, 2010: Second Field Test

Despite the capping of the well on July 15, 2010, BP conducted a second field test of Packgen's boom at its test site in Alabama on July 21, 2010.  PSAMF ¶ 97; DRPSAMF ¶ 97.  BP's summary of the field test results show that Packgen's boom performed well: "[t]he 200ft tested performed better than desired.  Even though this was only an 18" boom.  It did hold under high currents.  And without a top cable the fabric held the load with[out] fatigue.  The issue with water ballasting was gone."[71] PSAMF ¶ 98; DRPSAMF ¶ 98.   The material passed the decontamination test. PSAMF ¶ 99; DRPSAMF ¶ 99.

Following the field test on July 21, 2010, Mr. McFadden gave verbal approval to Packgen's boom.[72]    PSAMF ¶ 101; DRPSAMF ¶ 101.   Mr. Suarez informed Packgen that it was one of just three approved suppliers for 24" boom and that the other two suppliers could produce just 10,000 feet per week compared to Packgen's baseline of 40,000 feet per day.[73]  PSAMF ¶ 102; DRPSAMF ¶ 102.  BP informed Packgen that, even though the Macondo well had been capped on July 15, 2010, BP expected the cleanup efforts to continue at least until the end of 2010 and that boom

---

[71]    As BP noted in its response, Packgen did not support this statement with any citation to the record; nevertheless, BP admitted that an exhibit in the record supports the statement.  DRPSAMF ¶ 98.

[72]    Citing additional evidence, BP disputes the truth of the statement but does not dispute that it is supported by Packgen's record citations.  DRPSAMF ¶ 101.  The Court accepts Packgen's statement.

[73]    BP interposed a qualified response, admitting only "that *Packgen alleges*" the facts in PSAMF ¶ 102.  DRPSAMF ¶ 102.  The Court deems the statement admitted for purposes of summary judgment.

would be needed for these efforts.[74]  PSAMF ¶ 103; DRPSAMF ¶ 103.  At no point

did BP tell Packgen to stop producing boom.[75]  PSAMF ¶¶ 100, 104; DRPSAMF ¶¶

100, 104.

### 16.    Packgen Added to BP's Approved Vendor List

On August 18, 2010, Mr. Roberts emailed BP, stating, "I understand that

there is not a need right now for Boom, but if in the future there is I would like to

think that we are on your approved vendor list and could have the opportunity to

supply boom."  DSMF ¶ 64; PRDSMF ¶ 64.  On August 21, 2010, BP sent an email

to Mr. Roberts stating that Packgen had been added to BP's approved vendor list for

containment boom.   DSMF ¶¶ 16, 65; PRDSMF ¶¶ 16, 65; PSAMF ¶ 105;

DRPSAMF ¶ 105.[76]  BP and Packgen never had a written contract for the sale of

boom.[77]  DSMF ¶ 66; PRDSMF ¶ 66.  BP's integrity assessment coordinator Gene

---

[74]    BP interposed a qualified response, admitting only "that *Packgen alleges*" the facts in
PSAMF ¶ 103.  DRPSAMF ¶ 103.  The Court deems the statement admitted for purposes of
summary judgment.

[75]    BP interposed a qualified response, asserting that the record citations do not support the
statement.  DRPSAMF ¶ 104.  Having reviewed the record citations, the Court concludes that Mr.
Bigi's 30(b)(6) testimony supports a reasonable inference that BP never told Packgen to stop
producing boom.  When asked whether it was "part of the protocol to tell [a manufacturer] to stop"
producing boom, Mr. Bigi responded, "Their manufacturing of whatever it was they were making is
their business decision, not mine."  *Bigi 30(b)(6) Dep. (Ex. 5)*, 65:13-17 (ECF No. 80-5).

[76]    In PSAMF ¶ 106, Packgen states, "Although BP had made repeated promises to purchase
Packgen's boom during the preceding months, BP ultimately reneged on its oral commitments to
Packgen."  PSAMF ¶ 106.  BP denied that it had made any promises to Packgen to purchase boom
and noted that Packgen had not supported its statement with any evidence.  DRPSAMF ¶ 106.
Given the lack of a record citation, the Court cannot accept PSAMF ¶ 106.

In PSAMF ¶ 107, Packgen states, "This same thing happened to other boom manufacturers,"
citing a Wall Street Journal article.  PSAMF ¶ 107.  BP objected on hearsay grounds and asserted
that this statement is irrelevant to the issues before the Court.  The Court excludes this statement
from the summary judgment record because it is too vague and unsubstantiated to be considered a
material fact.

[77]    Packgen denied this statement, noting that Mr. Lapoint testified, "I have yet to sign a
contract in the conventional typical business world of here's a written contract that the rest of the
world understands to be."  PRDSMF ¶ 66.  Packgen also noted that "Mr. Lapoint and others
testified that an oral contract had been reached."  *Id.*  These arguments are consistent with DSMF ¶

Bautista said to the Wall Street Journal in mid-August 2010 that "[i]t is kind of crappy to tell people to build as much boom as they can and then don't accept it."[78] PSAMF ¶ 108; DRPSAMF ¶ 108.

### 17.   Packgen's Sales to Other Purchasers

Packgen sold a small portion of boom to PCI Products in May 2010, but only after consulting with legal counsel to have specific terms drafted for the sale of the boom and proposing a written agreement; Packgen did not use these terms for its normal transactions involving packaging products.[79]  DSMF ¶ 67; PRDSMF ¶ 67; PSAMF ¶ 113; DRPSAMF ¶ 113.  Packgen sold 317 linear feet of boom to Abhe & Svoboda on June 28, 2010.  DSMF ¶ 68; PRDSMF ¶ 68.

### 18.   Packgen's Efforts to Minimize Its Losses

BP has not paid Packgen for any of the boom that Packgen manufactured. DSMF ¶ 17; PRDSMF ¶ 17.  Packgen was left with 60,000 feet (approximately 12 miles) of completed boom in its warehouse, as well as materials that had been purchased but could not be used for Packgen's core business.  PSAMF ¶ 110; DRPSAMF ¶ 110.  Packgen made significant, good faith efforts to mitigate its

---

66, which denies the existence of a written contract, not the existence of any contract.  The Court accepts DSMF ¶ 66.

[78]    In PSAMF ¶ 109, Packgen states that "[t]his statement was said at the same time that BP internally was insisting that it still needed to have 1.7 million linear feet of containment boom on hand."  PSAMF ¶ 109.   BP interposed a qualified response, disputing Packgen's view of the chronology.  DRPSAMF ¶ 109.  Having reviewed Packgen's record citations, the Court concludes that they do not reference any internal BP communications in mid-August (when the Wall Street Journal article was published) discussing a need for 1.7 million feet of boom.  The Court excludes PSAMF ¶ 109 as unsupported.

[79]    Packgen interposed a qualified response to DSMF ¶ 67, noting that "[t]he document speaks for itself, does not include a quantity term and has no signature from Packgen."  PRDSMF ¶ 67.  The Court reviewed the record citation, agrees with Packgen that the written agreement was not signed by Packgen, and has amended DSMF ¶ 67 to reflect that Packgen proposed a written agreement rather than "had a written contract . . . signed on May 25, 2010."

damages after BP failed to honor its commitments.  PSAMF ¶ 111; DRPSAMF ¶ 111.  Packgen sold 60,000 feet of completed boom in September 2010 to the only purchaser it was able to find for $2 per linear foot.  PSAMF ¶ 112; DRPSAMF ¶ 112; DSMF ¶¶ 68-69; PRDSMF ¶¶ 68-69.  Packgen sold the remainder of its inventory at a reduced selling price because it believed that there was an overabundance of boom in the market.  DSMF ¶ 71; PRDSMF ¶ 71.

Packgen was unable to return several of the materials it purchased to manufacture boom for BP, including polypropylene, webbing, chain, and liner.  PSAMF ¶ 114; DRPSAMF ¶ 114.  Packgen was only able to return the foam and foam injector to its supplier for a loss.  PSAMF ¶ 115; DRPSAMF ¶ 115.  Packgen has made several attempts to sell the chain and liner to no avail.  *Id.*  Packgen has found ways to use portions of the webbing in some of its ordinary business activities.  *Id.*  In 2012, Packgen found a way to use the heavier polypropylene material it purchased for boom in its containers; however, Packgen had to spend considerable time, money, and resources to incorporate the heavier polypropylene material.  *Id.*  Since the resolution of the Gulf Coast spill, Packgen has not purchased raw materials to make boom nor has it manufactured any boom.  PSAMF ¶ 116; DRPSAMF ¶ 116.

Packgen filed a claim with the Gulf Coast Claims Facility on November 5, 2010.  DSMF ¶ 18; PRDSMF ¶ 18.

### 19.    BP's Cost Avoidance Accounting Practice

For its oil spill response, BP kept a supplier log, and awarded a $275,000 figure for each assessment performed.  PSAMF ¶ 124; DRPSAMF ¶ 124.  Mr. Suarez explained, "that number reflected estimated benefits in terms of cost avoidance, I think, related to completing a QMS audit to a supplier."  *Id.*  The $275,000 was the "cost avoidance amount" for each supplier assessment completed during the oil spill, and factored into employee bonuses.  PSAMF ¶ 125; DRPSAMF ¶ 125.  Mr. Bigi explained:

> We found a group practice that said a small -- a minor failure was worth a certain amount of dollars.  So, my logic said that, if by improving the performance of our suppliers and the management of our supplier organizations, we can essentially prevent one of those from happening.  Okay?  So, we could take credit for that value, preventing one bad thing from happening.[80]

PSAMF ¶ 122; DRPSAMF ¶ 122.

### 20.  BP's Guilty Plea[81]

---

[80]   BP interposed a qualified response, noting that the record citation does not refer to "bonus incentives." DRPSAMF ¶ 122. Having reviewed the record citation, the Court concludes that it does not refer in any way to "bonus incentives."  The Court has not included the portion of PSAMF ¶ 122 that mentions "bonus incentives."

Packgen proposed in PSAMF ¶ 123 the statement that Mr. Bigi "testified that the bonus based on 'preventing failures' was 'an excellent motivator for the team.'"  PSAMF ¶ 123.  BP interposed a qualified response, noting that the quoted testimony does not refer to or discuss bonuses.  DRPSAMF ¶ 123.  Having reviewed the quoted testimony, the Court agrees with BP that PSAMF ¶ 123 is unsupported by the record.

[81]   On June 10, 2013, Packgen filed an additional statement of material facts regarding BP's guilty plea to a number of criminal charges on January 29, 2013, in the United States District Court for the Eastern District of Louisiana.  PSAMF ¶¶ 136-47.  BP admitted the statements solely for the purposes of summary judgment, but requested that the Court strike them on the grounds that they are neither material nor relevant to this case.  DRPSAMF ¶¶ 136-47.

Packgen explains that these statements are relevant because BP's misrepresentations to congressional officials about the amount of oil that was spilling make it more likely that BP would have entered into an oral rather than written contract to purchase boom to avoid the existence of "written purchase orders for containment boom that were at variance with the statements it was making to Congress."  *Pl.'s Reply Mem. in Support of Request to File Supplemental Statement of Facts* at 3 (ECF No. 112); *see also Pl.'s Second Rule 56(e) Sur-Reply*.

Because BP is entitled to summary judgment whether or not evidence related to its guilty plea is considered, it is not necessary to resolve this dispute, and the Court includes the statements

On November 15, 2012, the United States Department of Justice filed an Information with the United States District Court for the Eastern District of Louisiana charging BP with violations of 18 U.S.C. § 1115 (Seaman's Manslaughter), 18 U.S.C. §§ 1319(c)(1)(A), 1321(b)(3) (Clean Water Act Violation), 16 U.S.C. §§ 703, 707(a) (Migratory Bird Treaty Act Violation), and 18 U.S.C. § 1505 (Obstruction of Congress). PSAMF ¶ 136. All of these charges related to the April 20, 2010 explosion on the *Deepwater Horizon* and its aftermath. PSAMF ¶ 137. On November 15, 2012, BP agreed to plead guilty to charges in the Information, including Count XIV for Obstruction of Congress in violation of 18 U.S.C. § 1505. PSAMF ¶ 138.

BP's guilty plea and allocution were accepted on January 29, 2013. PSAMF ¶ 147. In its allocution, BP admitted that it made false and misleading statements regarding the amount of oil flowing from the Macondo well in its May 24, 2010 response to an inquiry and investigation by the Committee on Energy and Commerce of the United States House of Representatives. PSAMF ¶¶ 139-40. BP admitted withholding information and documents prepared by BP engineers, including estimates prepared using the Bonn Agreement analysis, that showed flow rates far higher than 5,000 BOPD, including as high as 96,000 BOPD; BP also admitted falsely representing that its flow-rate estimates were the product of the

---

in its recitation of the facts. That said, if relevant, this evidence is at best marginally so. There is no evidence in Packgen's submission that the individuals at BP who were involved in making the misrepresentations to Congress had anything to do with Packgen, or conversely that the individuals at BP who were dealing with Packgen had anything to do with BP's misrepresentations to Congress. Thus, the asserted causal connection between BP's congressional misrepresentations and BP's dealings with Packgen is speculative. Unless Packgen presented evidence to fill this gap, this evidence would likely be excluded as either irrelevant under Rule 401 or prejudicial or confusing under Rule 403 were this case to go to trial. FED. R. EVID. 401, 403.

generally-accepted ASTM methodology when in fact they were based on a Wikipedia entry.  PSAMF ¶¶ 141-43.  BP admitted falsely representing that internal flow-rate estimates played an important part in Unified Command's decision on April 28, 2010, to raise its own flow-rate estimate to 5,000 BOPD.  PSAMF ¶¶ 144-45.  BP admitted falsely stating in a letter to Congressman Markey on or about June 25, 2010, that BP's worst case discharge estimate was raised from 60,000 to 100,000 BOPD based on "pressure data obtained from the BOP stack," when BP had in fact been aware of a 100,000 BOPD worst case scenario since April 21, 2010.  PSAMF ¶ 146.

## II.   THE PARTIES' POSITIONS

### A.   BP's Motion

BP maintains that even if it made the oral statements alleged by Packgen, all of Packgen's claims would still fail.  *Defs.' Mot.* at 1.  BP argues that the statute of frauds precludes enforcement of the alleged oral contract.  *Id.* at 3-7.  In BP's view, the specially manufactured goods exception does not apply because oil containment boom is not a specially manufactured good.  *Id.*

BP contends that Packgen's negligent and intentional misrepresentation claims must be dismissed because the alleged misrepresentations were promises of future actions rather than statements of fact and because there is no evidence that Packgen justifiably relied upon the alleged misrepresentations to its detriment.  *Id.* at 7-11.  BP argues that Packgen's unjust enrichment claim must be dismissed because Packgen conferred no benefit on BP.  *Id.* at 12-15.  BP urges the Court to

dismiss Packgen's promissory estoppel claim for three reasons: (1) the alleged comments were oral statements of a contract which is barred by the statute of frauds; (2) Packgen's reliance on the alleged oral statements was not reasonable; and (3) the alleged oral statements are not specific enough to enforce. *Id.* at 15-19.

### B.   Packgen's Opposition

Packgen responds that the alleged oral contracts are valid and enforceable under the specially manufactured goods and admission exceptions to the statute of frauds. *Pl.'s Opp'n* at 10-19. Packgen argues that the admission exception applies because BP has admitted the existence of a contract in a deposition. *Id.* at 12-14. Packgen argues that the specially manufactured goods exception applies because its boom was "specially manufactured for BP." *Id.* at 14-16. Packgen contends that its five sales of boom to purchasers other than BP between late May 2010 and late September 2010 did not occur in the ordinary course of its business. *Id.* at 16-18. Packgen argues that it made a "substantial beginning" only after speaking with BP's representatives, and denies that BP provided any notice of repudiation. *Id.* at 18-19.

Packgen calls BP's arguments for dismissal of its negligent and intentional misrepresentation claims "legally incorrect" and "factually inapposite." *Id.* at 19. Packgen argues that BP "made repeated and conflicting representations regarding its standards for boom manufacture" and promised to purchase Packgen's boom "as soon as the 'standards' were achieved." *Id.* at 20-21. Packgen says that this Court "has recognized that alleged opinions or promises of future performance can support

35

a misrepresentation claim," and argues that this Court "looks to the full relationship of the parties to determine whether the plaintiff was justified in relying on certain factual statements." *Id.* at 21-22. Packgen claims that "the focus of the inquiry is on BP's conduct." *Id.* at 23.

Packgen denies that the statute of frauds bars its promissory estoppel claim under Maine law. *Id.* at 24-27. For support, Packgen cites *Chapman v. Bomann*, 381 A.2d 1123 (Me. 1978), as a case in which the Law Court allowed a promissory estoppel claim to defeat a statute of frauds defense if "it would be grossly unjust and, therefore, tantamount to a fraud on the plaintiffs to allow defendant to assert the Statute of Frauds . . . ." *Pl.'s Opp'n* at 26 (quoting *Chapman*, 381 A.2d at 1129). Packgen distinguishes cases to the contrary as limited to the employment context. *Id.* at 26-27. Packgen suggests that BP did not act in good faith. *Id.* at 27.

Packgen contends that its unjust enrichment claim should not be dismissed because the benefit it conferred on BP was "technical information about Packgen's boom and the general standards for boom." *Id.* at 27-29. Packgen claims that BP's practice of assigning a cost avoidance amount to its manufacturer assessments supports this argument. *Id.* at 29-30.

## C.   BP's Reply

BP replies that its conduct does not fit within the admission exception to the statute of frauds because a personal deponent's authentication of an email does not constitute a testimonial admission. *Defs.' Reply* at 1-3. BP reiterates its argument that Packgen's boom was not a specially manufactured good. *Id.* at 3-7.

BP contends that allowing Packgen to go forward on its misrepresentation claims would "expand the law of misrepresentation into areas never previously found by Maine courts." *Id.* at 7. BP discusses the caselaw and attempts to distinguish the cases relied on by Packgen, arguing in particular that Packgen was not "at the mercy" of BP and had a meaningful opportunity to investigate BP's statements. *Id.* at 7-10. BP argues that its statements about how much boom it would need are too vague to be actionable. *Id.* at 10-11. BP contends that Packgen did not detrimentally rely on its statements regarding specifications because it had already purchased the raw materials. *Id.* at 11-12.

BP denies that a promissory estoppel claim can be used to circumvent the statute of frauds, distinguishing the cases cited by Packgen. *Id.* at 12-13. BP maintains that, in any case, Packgen's reliance was not reasonable, and claims that policy favors granting summary judgment on the promissory estoppel claim. *Id.* at 14-15. BP reiterates that summary judgment should be granted on Packgen's unjust enrichment claim, denying that Packgen conferred any benefit on BP. *Id.* at 15-17.

### D.   Packgen's Supplemental Opposition

Packgen contends that BP's acknowledgement that 90% of domestic boom production was committed to BP supports Packgen's claim that its boom was specially manufactured for BP. *Pl.'s Suppl. Opp'n* at 1-2. Packgen maintains that genuine issues of material fact preclude summary judgment on its misrepresentation and promissory estoppel claims. *Id.* at 2-3.

### E.      BP's Supplemental Reply

BP replies that the amount of domestic boom production committed to BP is immaterial to the specially manufactured goods question. *Defs.' Suppl. Reply* at 1. BP maintains that this evidence does not support Packgen's claims. *Id.* at 1-2. BP argues that conducting a field test does not imply any misrepresentation and provided a benefit only to Packgen. *Id.* at 2. BP notes that Packgen never produced any 24" boom other than for testing nor purchased raw materials after July 20, 2010, rendering any statements relating to 24" boom non-actionable. *Id.*

## III.   DISCUSSION

### A.      Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). For summary judgment purposes, "genuine" means that "a reasonable jury could resolve the point in favor of the nonmoving party," and a "material fact" is one whose "existence or nonexistence has the potential to change the outcome of the suit." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (citations omitted).

"The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case." *Phair v. New Page Corp.*, 708 F. Supp. 2d 57, 61 (D. Me. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "In determining whether this burden is met, the Court must view the

record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor." *Phair*, 708 F. Supp. 2d at 61 (citing *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004)).  However, the Court is not "required to 'accept as true or to deem as a disputed material fact, each and every unsupported, subjective, conclusory, or imaginative statement' made by a party." *Bonefant-Igaravidez v. International Shipping Corp.*, 659 F.3d 120, 123 (1st Cir. 2011) (quoting *Torrech-Hernández v. Gen. Elec. Co.*, 519 F.3d 41, 47 (1st Cir. 2008)). The summary judgment standard "is favorable to the nonmoving party, but it does not give him a free pass to trial."  *Nieves-Romero v. United States*, 715 F.3d 375, 2013 U.S. App. LEXIS 9089, *5 (1st Cir. 2013) (quoting *Hannon v. Beard*, 645 F.3d 45, 58 (1st Cir. 2011)).

### B.    Counts I and II: Misrepresentation

To prevail on a claim for intentional misrepresentation under Maine law, Packgen must prove by clear and convincing evidence that: (1) BP made a false representation, (2) of a material fact, (3) with knowledge of its falsity or in reckless disregard of whether it was true or false, (4) for the purpose of inducing Packgen to act in reliance upon it, and, (5) that Packgen justifiably relied upon the representation as true and acted upon it to Packgen's damage.  *See Berry v. Worldwide Language Resources, Inc.*, 716 F. Supp. 2d 34, 47 (D. Me. 2010) (citing *Rand v. Bath Iron Works Corp.*, 2003 ME 122 ¶ 9, 832 A.2d 771, 773 (Me. 2003)).

Maine looks to the Restatement (Second) of Torts to define the tort of negligent misrepresentation:

39

> One who . . . supplies false information for the guidance of others in
> their business transactions, is subject to liability for pecuniary loss
> caused to them by their justifiable reliance upon the information, if he
> fails to exercise reasonable care or competence in obtaining or
> communicating the information.

RESTATEMENT (SECOND) OF TORTS § 552(1) (1977); *see St. Louis v. Wilkinson Law
Offices, P.C.*, 2012 ME 116 ¶ 18, 55 A.3d 443, 447 (Me. 2012). In *St. Louis*, the Law
Court wrote:

> Whether a party made a misrepresentation and whether the opposing
> party justifiably relied on a misrepresentation are questions of fact.
> Additionally, liability only attaches if, when communicating the
> information, the party making the alleged misrepresentation fails to
> exercise the care or competence of a reasonable person under like
> circumstances, an inquiry that is likewise for the fact-finder. The
> defendant's knowledge is largely immaterial for negligent
> misrepresentation; the fact-finder's primary task is to ascertain
> whether the defendant's conduct was reasonable.

*St. Louis*, 2012 ME 116 ¶ 19, 55 A.3d at 447 (internal citations and punctuation
omitted).

"Claims for fraudulent and negligent misrepresentation, although distinct,
both require that the defendant make a false representation of present fact and that
the plaintiff justifiably rely on the representation as true." *Berry*, 716 F. Supp. 2d
at 48 (citing *Kearney v. J.P. King Auction Co.*, 265 F.3d 27, 34 n.8 (1st Cir. 2001)).
In general, "statements of opinion, promises of future performance, [and] mere
'puffing'" are not actionable under Maine law. *Uncle Henry's Inc. v. Plaut
Consulting Co., Inc.*, 399 F.3d 33, 43 (1st Cir. 2005). Indeed, "the breach of a
promise to do something in the future will not support an action of deceit, even
though there may have been a preconceived intention not to perform." *Schott*

40

*Motorcycle Supply, Inc. v. American Honda Motor Co., Inc.*, 976 F.2d 58, 65 (1st Cir. 1992) (quoting *Boivin v. Jones & Vining, Inc.*, 578 A.2d 187, 188 (Me. 1990)).

"In appropriate circumstances," however, a plaintiff may proceed based on statements of opinion or promises of future performance that are "sufficiently akin to averments of fact." *Kearney*, 265 F.3d at 35. The Maine Law Court long ago explained the basis for this exception in a passage that has become a touchstone:

> The relationship of the parties or the opportunity afforded for investigation and the reliance, which one is thereby justified in placing on the statement of the other, may transform into an averment of fact that which under ordinary circumstances would be merely an expression of opinion.

*Shine v. Dodge*, 130 Me. 440, 444, 157 A. 318, 319 (1931); *see also Wildes v. Pens Unlimited Co.*, 389 A.2d 837, 840 (Me. 1978) (quoting this passage); *Schott*, 976 F.2d at 65 (same); *Vielleux v. NBC*, 206 F.3d 92, 120 (1st Cir. 2000) (same); *Kearney*, 265 F.3d at 34-35 (same); *Uncle Henry's*, 399 F.3d at 43 (same); *Berry*, 716 F. Supp. 2d at 48 (same). Packgen maintained at oral argument that this exception applies here.

The *Shine* exception applies "under circumstances in which the plaintiff is 'at the mercy of the defendant,' such as in employment situations where an employer, with full knowledge of imminent corporate downsizing, nevertheless promises a position to a new salesperson." *Kearney*, 265 F.3d at 35 (quoting *Wildes*, 389 A.2d at 840-41). By contrast, the First Circuit held in *Schott* that the exception does not apply to "puffing" or "trade talk" between sophisticated commercial parties. *Schott*, 976 F.2d at 65. At oral argument, the Court asked Packgen if it could cite any case that had applied the *Shine* exception to communications between two businesses.

Following oral argument, Packgen submitted such a case. *Notice/Correspondence* (ECF No. 120). In *Greenell Corporation v. Penobscot Air Service, Ltd.*, No. 99-31-P-C, 1999 WL 33117116 (D. Me. Aug. 19, 1999), Greenell Corporation, a family-owned company, bought an airplane and entered into an agreement with Penobscot Air Service, Ltd., an air charter business, pursuant to which Penobscot Air would manage Greenell's airplane.[82] *Id.* Penobscot Air allegedly promised that it "would always have a second set of pilots available to fly [Greenell's] plane when a customer requested a charter" but in fact did not and refused to accept unscheduled "pop-up" flights. *Id.* at *3, 7-9. In denying summary judgment on a fraudulent misrepresentation claim based on this alleged promise, the Court distinguished *Schott* and noted that "case law only requires that the plaintiff be 'at the mercy of' the defendant with respect to the specific representation at issue." *Id.* at *8.

Packgen claims that three types of representations made by BP qualify as actionable statements of material fact: "(1) what, at a particular point in time during the oil spill saga, BP required for its specification, (2) its intention to purchase Packgen's boom, and (3) how much boom it needed at any particular time." *Pl.'s Opp'n* at 22. Packgen emphasized at oral argument that the Court must analyze these representations together, in the context of the full record.

### 1.    BP's Specifications

---

[82]     Following oral argument, Packgen cited four cases to support its *Shine* argument. The others are *Forum Financial Group v. President and Fellows of Harvard College*, No. 00-306-P-C, 2002 WL 31175454 (D. Me. Sept. 30, 2002); *Webster Industries, Inc. v. Northwood Doors, Inc.*, 320 F. Supp. 2d 821 (N.D. Iowa 2004); and *Thor Bear, Inc. v. Crocker Mizner Park, Inc.*, 648 So.2d 168 (Fla. Dist. Ct. App. 1995).

BP distinguishes all four cases as involving alleged misrepresentations that induced plaintiffs to enter into written contracts, whereas here the alleged misrepresentation is a "promise to contract in the future for commercial goods." *Defs.' Suppl. Br.* at 2.

Packgen contends that "BP made repeated and conflicting representations regarding its standards for boom manufacture." *Id.* at 20. Reviewing the evidence in the light most favorable to Packgen, BP's Supplier Quality Control Specialist Max Lyoen visited Packgen on May 11, 2010, less than a month after the beginning of the oil spill, and told Packgen that Packgen's end connectors met BP's requirements and that Packgen needed to have its boom evaluated by a third party for ASTM compliance. On May 26, 2010, after receiving Packgen's specifications, BP's Deenan Arcot emailed Packgen to express concern about Packgen's "[v]ery different construction." Also on May 26, 2010, BP first raised concerns about Packgen's end connectors. BP began drafting a written specification for 18" boom in June 2010, and completed it on June 18, 2010. At some point thereafter, BP began requesting that boom manufacturers complete a deviation form showing differences from the written specification; in late June 2010, BP made a number of specific requests for technical changes to Packgen's boom.

Although the evidence supports Packgen's assertion that BP made conflicting representations regarding its specification, an action for negligent or intentional misrepresentation requires something more: a "false representation of present fact." *Berry*, 716 F. Supp. 2d at 48. There is no evidence that BP's representations to Packgen regarding its requirements were false at the time they were made. As may be expected in an emergency, BP's standards and requirements developed over time, as it scrambled to contain the oil spill. The Court concludes that none of BP's

statements regarding its specifications is actionable for negligent or intentional misrepresentation.

### 2. BP's Intention to Purchase Packgen's Boom

Second, Packgen asserts that BP's representations regarding its intention to purchase Packgen's boom are actionable for tortious misrepresentation. Reviewing the evidence in the light most favorable to Packgen, in early May 2010 BP's Mario Araya made an oral commitment to Packgen's Dan Forte to purchase all present and future boom that Packgen produced for $21.75 per square foot, subject to a visit by BP personnel to inspect Packgen's facility and to certify Packgen's boom capacity. When Mr. Lyoen visited Packgen's facility on May 11, 2010, he said that BP would purchase Packgen's full capacity as soon as Packgen provided third-party testing results showing compliance with ASTM standards and BP's specifications. Mr. Araya confirmed BP's intentions the next day: "I'm placing an order. We'll take it all." On May 23, 2010, BP's Matt Pavlas stated that BP intended to purchase Packgen's entire stock of boom, and would immediately purchase Packgen's current inventory of 42,000 linear feet of boom. On June 30, 2010, BP's Charles Bigi told Packgen that it would be BP's supplier for 24" boom if it "could adapt its manufacturing process." On July 21, 2010—after the well had been capped—BP notified Packgen that it was an approved supplier for 24" boom and informed Packgen that boom would be needed at least until the end of 2010.

That BP did not purchase any boom from Packgen does not mean that its expressions of intent to purchase Packgen's boom were false when made. There is

no evidence that BP told Packgen it intended to purchase Packgen's boom when BP had no such intention. To the contrary, BP's purchase of over two million feet of boom from twenty-six different manufacturers strongly implies that BP's interest in Packgen was genuine. BP had nothing to gain from stringing Packgen along, and spent resources to send representatives to Packgen's facility and conduct field tests of Packgen's boom. The evidence permits no reasonable inference other than that BP fully intended to purchase boom from Packgen as soon as Packgen's design was acceptable (assuming its need for boom persisted). The expressions of intention were usually contingent on the acceptability of Packgen's design. As indicated by an email sent by Packgen's Dan Forte on May 12, Packgen understood that negotiations were ongoing: "[T]hank you for discussing the details of a possible transaction with Packgen. . . . What remains is the issue concerning the acceptability [of] our design . . . ." Shortly after Mr. Pavlas reiterated BP's intention to purchase on May 23, 2010, Mr. Roberts emailed Mr. Pavlas about scheduling a conference call with Packgen's owner "to discuss possible working relationship." By the time BP was finally comfortable enough with Packgen's design to designate Packgen as an approved supplier of 24" boom, the well had been capped. As there is no evidence that BP's expressions of intention to purchase Packgen's boom were false when made, they cannot support an action for negligent or intentional misrepresentation.[83]

---

[83]    Even if BP's alleged expressions of intention to purchase Packgen's boom were false when made, the general rule is that "the breach of a promise to do something in the future will not support an action of deceit, even though there may have been a preconceived intention not to perform." *Shine*, 130 Me. at 443. Although Maine courts have crafted an exception for promises sufficiently

### 3.    BP's Boom Needs

Third, Packgen asserts that BP's representations regarding its critical need

for boom are actionable for tortious misrepresentation.  These representations, at

least those made prior to the well's capping on July 15, 2010, were not only not

false, but were borne out by BP's purchase of over two million feet of boom from

---

"akin to averments of fact," this exception has typically been applied in at-will employment cases, where an employee is "at the mercy" of his employer concerning continued employment.

The Court accepts Packgen's point that the *Shine* exception has occasionally been applied to transactions between businesses.  In *Greenell*, the Magistrate Judge reviewed Maine caselaw applying the *Shine* exception to at-will employment situations and implicitly drew an analogy to those cases based on the undisputed fact that "Greenell trusted Clinton Demmons and Penobscot Air's expertise in the aviation industry and relied heavily on [them] as Greenell knew nothing about aviation."  *Greenell*, 1999 WL 33117116 at *8.  It is true that the Magistrate Judge in *Greenell* concluded that for *Shine* to apply, a business need only be "at the mercy of the defendant with respect to the specific representation at issue," not "entirely at the mercy of the defendant", *id.*, and later applied the same principle to a lawsuit between two sophisticated entities.  *See Forum Fin. Grp. v. President and Fellows of Harvard Coll.*, No. 00-306-P-C, 2002 WL 31175454 (D. Me. Sept. 30, 2002).

Nevertheless, even though the *Shine* exception has, in a few cases, been extended to promises between businesses, it remains an exception, not the rule, and for good reason.  Were the *Shine* exception commonly available, plaintiffs would be encouraged to maintain a tort action for what is really a breach of contract, and by this formalistic maneuver to avoid inconvenient aspects of contract law—for instance, the statute of frauds.  The law of contracts is premised on the notion that contractual promises warrant special rules.  Here, BP's oral promises to purchase Packgen's boom were neither unusual nor "akin to averments of fact."

The Court is troubled by the wholesale extension of *Shine* to what would otherwise be a straightforward contractual dispute.  Were the Court to hold that tort law provides a basis for recovery for the breach of BP's alleged promises, it would undermine the basic premise of contract law and the statute of frauds.  It is rare in any contractual dispute that one party cannot make a plausible claim that it was at the mercy of the other, particularly with regard to representations of intention.  In a manufactured goods context, for example, the buyer depends upon the expertise and skill of the seller to produce a suitable product and, once the product is made, the seller depends upon the willingness and ability of the buyer to accept the goods and pay the price.

This extension is even more problematic in the context of a motion for summary judgment.  If a motion for summary judgment could be defeated by making a *Shine* argument and presenting it as a disputed question of fact, the exception would become the rule and the salutary purposes of the statute of frauds would effectively be judicially nullified.  The Court remains skeptical that *Shine* would apply in the circumstances of this case.

The Court does not reach the *Shine* question, however, given its conclusion that there is no evidence that any of BP's statements were false when made.  *Cf. Greenell*, 1999 WL 33117116 at *9 ("Waters' testimony can be construed to support a finding that the defendant knew at the time the alleged representation was made that it did not and would not have sufficient pilot crews to make the plaintiff's plane available whenever a customer asked to charter it"); *Forum Fin. Grp.*, 2002 WL 31175454 at *12 ("the evidence . . . would allow a factfinder to conclude that [the representations] were false when made").

twenty-six different manufacturers.  BP apparently informed Packgen that even after the well was capped, BP expected the cleanup efforts to continue at least until the end of 2010 and that boom would be needed for these efforts.  The evidence, viewed in the light most favorable to Packgen, does not suggest that this statement misrepresented BP's expectations at the time it was made.  The Court grants summary judgment for BP on Counts I and II.

## C.    Count III: Breach of Contract

Maine's statute of frauds provides that a contract for the sale of goods for the price of $500 or more is generally not enforceable "unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent."  11 M.R.S. § 2-201(1).  Packgen does not argue that any of its communications with BP constitute the signed writing required for enforceability under 11 M.R.S. § 2-201(1).  Packgen instead argues that two exceptions to the signed writing requirement apply.

### 1.    The Specially Manufactured Goods Exception

The "specially manufactured goods" exception to the statute of frauds applies:

> If the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement[.]

11 M.R.S. § 2-201(3)(a); *see generally* CORBIN ON CONTRACTS § 4.21 (Dec. 2012). The

Fifth Circuit explained the exception in *Impossible Electronics Techniques, Inc. v.*

*Wackenhut Protective Systems, Inc.*, 669 F.2d 1026 (Former 5th Cir. 1982):

> The Statute exempts contracts involving "specially manufactured"
> goods from the writing requirement because in these cases the very
> nature of the goods serves as a reliable indication that a contract was
> indeed formed. . . . The term "specially manufactured," therefore, refers
> to the nature of the particular goods in question and not to whether
> the goods were made in an unusual, as opposed to the regular,
> business operation or manufacturing process of the seller. . . . The
> crucial inquiry is whether the manufacturer could sell the goods in the
> ordinary course of his business to someone other than the original
> buyer. If with slight alterations the goods could be so sold, then they
> are not specially manufactured; if, however, essential changes are
> necessary to render the goods marketable by the seller to others, then
> the exception does apply.

*Id.* at 1036-37. "Unsalability . . . must be based on the characteristics of special

manufacture, rather than on such tests as lost market opportunities or a seller's

unrelated inability to dispose of the goods." *RIJ Pharm. Corp. v. Ivax Pharm., Inc.*,

322 F. Supp. 2d 406, 417 (S.D.N.Y. 2004). "[W]hether the undisputed facts satisfy

the requirements of the specially manufactured goods exception to the Statute of

Frauds, is a question of law." *Chambers Steel Engraving Corp. v. Tambrands, Inc.*,

895 F.2d 858, 860 (1st Cir. 1990).

Here, the undisputed evidence establishes that Packgen sold to another

buyer the 60,000 feet of boom it claims to have manufactured for BP. There is no

evidence that Packgen modified the boom in any way to make it salable. Although

the purchase price of $2 per foot was much lower than the $18.75 Packgen claims to

have negotiated with BP, the undisputed evidence establishes that the reduced

price resulted from market conditions rather than from any "characteristics of

48

special manufacture." *RIJ Pharm.*, 322 F. Supp. 2d at 417.  Packgen modified its design based on input from BP, but there is no evidence that these modifications rendered the boom "not suitable for sale to others in the ordinary course of the seller's business."  11 M.R.S. § 2-201(3)(a).

Packgen emphasized in its brief and at oral argument the phrase "in the ordinary course of the seller's business," arguing that "Packgen never manufactured boom until after an environmental disaster in 2010, oral communications with Araya about BP's critical need for boom, and Lyoen's immediate visit to Packgen on May 11, 2010."  *Pl.'s Opp'n* at 15.  However, the undisputed evidence establishes that Packgen decided to enter the boom market on its own, that it began constructing boom manufacturing equipment before beginning discussions with BP, that it initiated contact with BP, and that it sold boom to two other purchasers in May and June 2010.  Although Packgen was new to the boom industry, Packgen has presented no evidence or authority that would support a conclusion that the boom it allegedly manufactured for BP was "not suitable for sale to others in the ordinary course of" its business.  11 M.R.S. § 2-201(3)(a).

At oral argument, Packgen maintained that whether its boom was suitable for sale to others in the ordinary course of its business is a disputed question of fact that warrants trial, noting that the *Impossible Electronics* Court held that summary judgment was inappropriate.  The goods in *Impossible Electronics*, however, were closed-circuit television security cameras that "had been specially adapted to adjust automatically to the extreme nighttime darkness at the Wackenhut residence and

to the glaring daytime sunlight reflecting off the beach and the sea." 669 F.2d at 1037.  In holding that summary judgment was inappropriate, the *Impossible Electronics* Court wrote that "the term 'specially manufactured' . . . refers to the nature of the particular goods in question and not to whether the goods were made in an unusual, as opposed to the regular, business operation or manufacturing process of the seller." *Id.*  Given the unusual nature of the cameras in *Impossible Electronics*, there was a genuine issue of material fact regarding marketability to another purchaser.  Here, there is not.  Packgen has presented no evidence that its boom was specially adapted in a way that made it harder to resell; to the contrary, as Packgen elsewhere strenuously argues, the boom met an international standard. In fact, Packgen resold the boom without any alterations.

Packgen also argued in its brief and at oral argument that actual resale does not necessarily foreclose the specially manufactured goods exception. *Pl.'s Opp'n* at 17-18.  The two cases it cites offer little support for this contention and are factually distinguishable.  In *R.M. Schultz & Assoc., Inc. v. Nynex Computer Servs. Co.*, No. 93 C 386, 1994 WL 124884 (N.D. Ill. Apr. 11, 1994), the Plaintiff manufactured specialized multi-media advertising display systems. *Id.* at *1.  The *Schultz* Court stated that "the test for specially manufactured goods is . . . whether the Plaintiff could make only 'slight,' as opposed to 'essential,' changes to make the goods marketable to others." *Id.* at 6.  The goods in *Schultz* were not resold, and the Court denied summary judgment because there was evidence "that at least one of the major components of the Head End System, the 286 AT computer, had no other

50

alternative uses and could only be sold for scrap value" and that several other system components "could not be reconfigured." *Id.* In *Balfour & Co., Inc. v. Lizza & Sons, Inc.*, 1969 WL 11070 (N.Y. Sup. June 10, 1969), the trial court found that certain "tailor-made" "steel rolling doors . . . fabricated with specific dimensions to fit designated openings" were specially manufactured. *Id.* The trial court found that it would have been "impractical to cut or adjust the doors for use at another site" and that their resale value was limited to their scrap value. *Id.*

In both *Schultz* and *Lizza*, there was a genuine question whether the goods, which were custom-made and specialized, could be resold without significant alterations. In this case, by contrast, the goods—boom manufactured to an international standard—were basically a commodity and were in fact resold without any alterations. Although the resale price was far below the price Packgen claims to have negotiated with BP, it is undisputed that the depressed price was caused by an overabundance of boom in the market. The Court concludes that there is no genuine issue of material fact as to whether Packgen's boom was a specially manufactured good under 11 M.R.S. § 2-201(3)(a).

## 2.    The Judicial Admission Exception

The statute of frauds contains a "judicial admission" exception that applies:

> If the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted[.]

11 M.R.S. § 2-201(3)(b); *see generally* CORBIN ON CONTRACTS § 14.2 (Dec. 2012). The Maine Law Court explained:

> Although limited in scope, this provision of the Code was intended to deny the benefit of the statute of frauds to one who in court, whether by pleading, testimony or otherwise, admits the existence of the oral contract sued upon.  The ultimate design of this legislation is to limit the use of the statute of frauds as a shield against unfounded fraudulent claims resting in parol, while removing from the arsenal of an unscrupulous litigant an unrighteous defense against a just claim.

*Dehahn v. Innes*, 356 A.2d  711, 717 (Me. 1976).  In other words, the judicial admission exception prevents a defendant from thumbing its nose at a plaintiff by admitting an oral agreement while at the same time raising a statute of frauds defense.  The admission need not be of a "contract" or an "agreement" per se; an admission of "the existence of the facts necessary to the formation of the oral agreement" is sufficient.  *Paris Utility Dist. v. A.C. Lawrence Leather Co.*, 665 F. Supp. 944, 957 (D. Me. 1987) (citing *Dehahn*, 356 A.2d at 717-18); *see also Fitzwilliam v. Flood*, Civil Action Docket No. CV-90-176, 1990 Me. Super. LEXIS 120, *3-5; Corbin on Contracts § 14.2[4] (Dec. 2012) ("an admission of the facts upon which the allegation of contract rests is sufficient"); Lawrence's Anderson on the Uniform Commercial Code 2-201:304 (Dec. 2012) ("It is not necessary that there be an express statement that the party 'admits' the making of an oral 'contract.'  It is sufficient that the party's words or conduct reasonably lead to that conclusion").  The Seventh Circuit explained:

> [A]n admission . . . need not expressly acknowledge the existence of a contract, nor need it describe all of its terms.  The admission need only describe conduct or circumstances from which the trier of fact can infer a contract.  Whether the defendants' statements admit the existence of a contract is a question of fact.  Thus, summary judgment should not be granted if there is a genuine issue whether the statements admit the existence of a contract.

*Gruen Industries, Inc. v. Biller*, 608 F.2d 274, 278 (7th Cir. 1979).  Similarly, a

leading treatise advises:

> Dismissal should not be granted where controversy appears to relate, not to the facts themselves, but rather to their implications or to the applicable rule of law.  If the defendant, though denying having entered a "contract," admits facts which may reasonably be held to verify plaintiff's allegations, the statutory defense should be barred, even though reasonable persons might differ as to the meaning of the facts admitted.  The statute does not give a party the privilege of imposing its private interpretations or conclusions upon the court. . . .

> On the other hand, if the critical facts themselves are the focus of controversy, summary judgment for defendant is proper . . . .  Issues of credibility are precisely the domain of the statute, and this is true even where plaintiff's version of the facts is as credible as defendant's.  The survival of such issues beyond the discovery period should preclude trial on the merits.  In this way, defendant has the benefit of the statute commensurate with its fundamental purpose, while plaintiff is protected from defendant's good faith misapprehension of law and, perhaps, to a lesser extent, from perjury and misrecollection of fact as well.

CORBIN ON CONTRACTS § 14.2[4].

Although the statute explicitly requires that the admission be made "in [the defendant's] pleading, testimony or otherwise in court," a treatise reports that "[t]he majority of courts" has nonetheless held "that a person who makes a non-judicial admission of a contract cannot plead noncompliance with the statute of frauds as a defense to its enforcement.  Thus, it is said that, when the defendant admits making an oral contract, it may be enforced, although the requirements of the statute of frauds have not been satisfied."  LAWRENCE'S ANDERSON ON THE UNIFORM COMMERCIAL CODE 2-201:310.

Packgen argues that the judicial admission exception is satisfied by BP's Charles Bigi's authentication in his personal deposition of an internal email he

wrote to Brian Miller on May 29, 2010, stating, "I do not understand why we keep placing orders with suppliers like this." *Pl.'s Opp'n* at 13.  Packgen contends that its interpretation of this email is supported by a subsequent internal email exchange on June 6, 2010, in which one of BP's technical authorities wrote that "large orders had been placed with companies unheard of in the industry 46 days ago," and Mr. Bigi responded, "[b]een singing the same song." *Id.*  Packgen maintains that "Bigi's emails combined with (1) earlier email correspondence between Forte and Araya, (2) Araya's internal email noting that Packgen 'agreed to no up front payment,' (3) Lyoen's visit to Packgen, (4) Pavlas's phone call with Packgen on May 23, 2010, (5) Bigi's phone call with Packgen on May 26, 2010, and (6) Mcfadden's email to Packgen telling Packgen to 'work on getting the material to make 24" boom' provide conduct and circumstances from which a trier of fact can infer a contract." *Id.* at 13-14.

BP counters that Packgen "attempts to contort the evidence," observes that "while Mr. Bigi may have authenticated the document in question, that document does not state that BP had placed an order with Packgen, and Mr. Bigi clearly stated under oath that he was not aware of any oral orders to purchase boom from Packgen," and denies that Mr. Bigi's testimony represents an admission of BP. *Defs.' Reply* at 3.   BP contends that "the plain purpose behind the Statute of Frauds" favors dismissal.

Packgen claims that in its initial conversation with BP in early May 2010, BP's Mario Araya "made an oral commitment" to purchase all present and future

boom Packgen produced for $21.75 per square foot, subject to a visit by BP and certification.  The record citations for this fact, however, are to the depositions of two Packgen employees, and there is no indication that Mr. Araya or anyone from BP admitted making such a commitment.  As BP contests the "critical fact" of Mr. Araya's alleged statement—rather than its possible legal implications—this statement does not count as an admission that could satisfy the judicial admission exception to the statute of frauds.  DRPSAMF ¶ 15 ("BP denies that Mr. Araya agreed to a price of $21.75 per square foot and denies that Mr. Araya committed to purchase all present and future boom"); *see* CORBIN ON CONTRACTS § 14.2[4].

Packgen claims that during Max Lyoen's May 11, 2010 visit to Packgen's facility, Mr. Lyoen stated "that BP would purchase Packgen's full capacity as soon as Packgen provided third-party testing results showing compliance with ASTM standards and established that its procedures and boom met BP's specifications."  Again the record support for this statement comes from Packgen employees, and there is no indication that Mr. Lyoen or anyone from BP has admitted that Mr. Lyoen made this statement.  As BP contests the "critical fact" of Mr. Lyoen's alleged statement—rather than its possible legal implications—this statement does not count as an admission that could satisfy the judicial admission exception to the statute of frauds.  DRPSAMF ¶ 30 ("BP denies that Mr. Lyoen stated that BP would purchase Packgen's capacity"); *see* CORBIN ON CONTRACTS § 14.2[4].  Moreover, Packgen admits that its president and owner John Lapoint sent an email later that day that casts serious doubt on Packgen's assertions, as Mr. Lapoint wrote that

Packgen was "just waiting on BP to make their decision one way or [an]other." DSMF ¶ 30; PRDSMF ¶ 30.

Packgen claims that the next day, May 12, 2010, Mr. Araya stated by phone, "I'm placing an order.  We'll take it all."  Again, however, BP has not admitted this "critical fact," and Packgen has admitted that its employee Dan Forte sent an email to Mr. Araya the next day that casts serious doubt on Packgen's recollection of the phone call, as it thanked Mr. Araya "for discussing the details of a possible transaction with Packgen."  DRPSAMF ¶ 31; DSMF ¶ 31; PRDSMF ¶ 31.  Packgen has also admitted that Mr. Forte sent an email to BP's Matt Pavlas on May 18, 2010, stating that "Packgen would appreciate any opportunity to sell DIRECTLY to BP," and that Mr. Forte sent another email on May 22, 2010, stating, "I hope the information from the third party review helps in the decision making process." DSMF ¶ 34; PRDSMF ¶ 34; DSMF ¶ 39; PRDSMF ¶ 39.  Packgen contends that the exception is satisfied by "Araya's internal email noting that Packgen 'agreed to no up front payment,'" *Pl.'s Opp'n* at 13, but this statement does not support an inference that a contract for sale had been reached, particularly in light of Mr. Forte's subsequent email referring to a "possible transaction."  BP has admitted that Mr. Araya told Mr. Forte on May 13, 2010, "I don't even know your production cost," but this statement also does not support an inference that BP and Packgen had entered into a binding agreement.  DSMF ¶ 32.  The Court concludes that BP has made no admissions that would satisfy the judicial admission exception to the statute of frauds for a contract reached on May 12 or 13, 2010.

Packgen claims that on May 23, 2010, Mr. Pavlas contacted Mr. Roberts by phone and stated "that BP intended to purchase Packgen's entire stock of boom, and would immediately purchase Packgen's current inventory of 42,000 linear feet of boom." PSAMF ¶ 47. Again, however, Mr. Pavlas has not admitted making this statement, testifying instead that he "did not recall what we talked about, if there was a conversation." DRPSAMF ¶ 47. And again, Packgen admits the existence of a subsequent email from Mr. Roberts to Mr. Pavlas that casts doubt on Packgen's assertions, as it refers to a "possible working relationship" rather than an existing binding agreement. DSMF ¶ 40; PRDSMF ¶ 40. The Court concludes that BP has made no admissions that would support a reasonable inference that a binding agreement was reached on May 23, 2010.

Packgen claims that "Bigi's phone call with Packgen on May 26, 2010" satisfies the exception. *Pl.'s Opp'n* at 13-14. In that phone call, however, Mr. Bigi expressed concerns about Packgen's end connectors, and on the same day, BP sent Packgen an email stating that there was a "definite CANNOT USE, on this product at this time." PSAMF ¶¶ 50-51; DRPSAMF ¶¶ 50-51; DSMF ¶¶ 49-50; PRDSMF ¶¶ 49-50. The Court concludes that, even when viewed in the light most favorable to Packgen, these statements do not support a reasonable inference that a binding agreement existed between Packgen and BP.

Packgen pins its greatest hopes on two internal emails from Charles Bigi, one sent May 29, 2010, and another June 6, 2010. *Pl.'s Opp'n* at 13. In the first, sent to Brian Miller, Mr. Bigi writes, "I do not understand why we keep placing orders with

57

suppliers like this."  PSAMF ¶ 117.  Mr. Bigi's authentication of this email during his deposition amounts to an admission by BP that he made this statement.  The question is whether, as Packgen contends, the statement supports a reasonable inference that a contract existed.  The Court concludes that, viewing the statement in the context of the rest of the undisputed evidence, and viewing the entire record in the light most favorable to Packgen, Mr. Bigi's email does not support such an inference.  Viewed in a vacuum, the email arguably does permit an inference that BP had placed an order with Packgen.  But to what order does this email supposedly refer?  The Court has reviewed all of the preceding communications between Packgen and BP that BP has admitted and that Packgen claims support an inference that a binding agreement existed, and determined that they do not; moreover, Packgen has admitted making statements that make clear that Packgen viewed the conversations at the time as a series of ongoing negotiations concerning a "possible working relationship."  It would therefore not be reasonable, based on BP's internal statement, "I do not understand why we keep placing orders with suppliers like this," to draw an inference that a contract existed.  In addition, the judicial admission exception provides that "the contract is not enforceable under this provision beyond the quantity of goods admitted."  11 M.R.S. § 2-201(3)(b).  Mr. Bigi's email does not refer to any quantity of goods.  The Court views Mr. Bigi's email on June 6, 2010, which states "[b]een singing the same song," as no different from his May 30, 2010 email.

Packgen also claims that BP's John McFadden's July 13, 2010 statement, "[p]lease work on getting the material to make 24" boom," supports a reasonable inference that a contract existed. *Pl.'s Opp'n* at 13-14. Again the Court disagrees. The statement supports an inference that BP was interested in purchasing boom from Packgen, not that it had entered into a binding agreement to do so; in addition, the statement does not refer to quantity, which it must to satisfy 11 M.R.S. § 2-201(3)(b).

At oral argument, Packgen focused on its statement of material fact number 71:

> Following the second audit, Suarez told Lapoint and Roberts that BP still had a need for 1.5 million feet of boom and that BP would purchase Packgen's capacity. Suarez also stated that Packgen would be "busy for a long time."

PSAMF ¶ 71. BP responded:

> Qualify. These statements represent *Mr. Lapoint's recollection* of communications with Mr. Suarez. BP has not admitted to any such statement nor was Mr. Suarez asked that question during his deposition.

DRPSAMF ¶ 71. Packgen contends that BP's response "violates Rule 56" because it is not supported with a record citation. Given the lack of a record citation to support a denial, Packgen urges the Court to deem the statement admitted and to hold that it satisfies the judicial admission exception.[84]

---

[84]   Packgen makes the same argument with regard to its statements of material fact numbers 54 and 117. The Court's analysis of statement 54 is the same as for statement 71, except that statement 54 does not satisfy the judicial admission exception for an additional reason: it does not refer to a quantity of goods. Statement 117 presents a different question because it refers to an email that a BP employee authenticated; the Court discusses PSAMF ¶ 117 above.

The Second Circuit rejected a similar argument in *Radix Organization, Inc. v. Mack Trucks, Inc.*, 602 F.2d 45 (2d Cir. 1979):

> Appellants' argument . . . that the alleged oral contract is enforceable under section 2-201(3)(b) is equally without merit.  Section 2-201(3)(b) permits enforcement of an oral contract if the defendant admits in his pleading, testimony, or otherwise in court that the contract was made.  Appellants contend that appellees made such an admission in their Rule 9(g) statement.  Paragraph 10 of that statement begins, "(t)he following facts are alleged by plaintiffs and assumed solely for purposes of this summary judgment motion."  There follows a recital of the allegations in paragraphs 6 through 11 and 13 through 15 of appellants' Rule 9(g) statement, including appellants' allegations concerning the making of an oral contract.  By this recital, appellees did not admit the making of a contract.  They simply repeated appellants' allegations as a predicate for their own defense of the Statute of Frauds.  The assertion of that defense would be somewhat meaningless in the absence of an assumed-for-the-argument oral agreement.

*Id.* at 48.  In other words, an admission for purposes of summary judgment is not an admission for purposes of the statute of frauds.

Typically, the failure of a party to properly controvert a statement of material fact is deemed an admission of that fact.  D. ME. LOC. R. 56(f); *see Cormier v. Fisher*, 404 F. Supp. 2d 357, 362 n.2 (D. Me. 2005); *Cosme-Rosado v. Serrano-Rodriguez*, 360 F.3d 42, 45 (1st Cir. 2004) ("[F]ailure to present a statement of disputed facts, embroidered with specific citations to the record, justifies the court's deeming the facts presented in the movant's statement of undisputed facts admitted") (quoting *Ruiz Rivera v. Riley*, 209 F.3d 24, 28 (1st Cir. 2000)).  However, in the unique circumstances of the judicial admission exception to the statute of frauds, the rule is different because the typical process stands on its head.  Here, Packgen failed in discovery to establish a BP admission that would qualify under the judicial

60

admission exception.   Instead, it posited assertions of its own employees as statements of material fact and attempted to place the onus on BP not only to deny them, but also to proffer evidence justifying the denial.   In these unusual circumstances, the Court holds Packgen to what Packgen itself found during discovery.

Another federal district court has observed that "if there has been an opportunity for an admission, courts have found the Judicial Admissions exception inapplicable and dismissed the action as barred by the Statute of Frauds." *Marvin Inc. v. Albstein*, 386 F. Supp. 2d 247, 252 (S.D.N.Y. 2005).   The Seventh Circuit, in a similar case, noted that "[a] plaintiff cannot withstand summary judgment by arguing that although in pretrial discovery he has gathered no evidence of the defendant's liability, his luck may improve at trial." *DF Activities Corp. v. Brown*, 851 F.2d 920, 922 (7th Cir. 1988).   In *Albstein* and *Brown*, the defendant submitted a sworn affidavit denying having entered into an oral agreement.   Here, BP has not submitted an affidavit from Mr. Suarez, but it has consistently denied that it entered into an oral agreement, and has supported its denial with the sworn statements of other employees.   Moreover, Mr. Suarez was deposed, giving Packgen an opportunity to ask him whether he made the statements Mr. Lapoint claims he did.   Packgen apparently did not ask him this question.   In the face of BP's consistent denial that it entered into an oral agreement, Packgen's failure to ask Mr. Suarez whether he made the statements Packgen alleges he did does not

generate a triable issue of fact as to whether BP has made a judicial admission that would satisfy the statute of frauds.

Having reviewed all of the statements that Packgen claims satisfy the judicial admission exception to the statute of frauds, the Court concludes that BP has not admitted facts that would support a reasonable inference that it entered into a contract with Packgen. Accordingly, summary judgment is appropriate for BP on Count III.

### D.    Count IV: Restitution/Quasi-Contract/Unjust Impoverishment

Under Maine law, "[a] claim for unjust enrichment requires the complaining party to show that: (1) it conferred a benefit on the other party; (2) the other party had appreciation or knowledge of the benefit; and (3) the acceptance or retention of the benefit was under such circumstances as to make it inequitable for it to retain the benefit without payment of its value." *Platz Assocs. v. Finley*, 2009 ME 55 ¶ 27, 973 A.2d 743, 750. "A valid claim in quantum meruit requires: that (1) services were rendered to the defendant by the plaintiff; (2) with the knowledge and consent of the defendant; and (3) under circumstances that make it reasonable for the plaintiff to expect payment." *Paffhausen v. Balano*, 1998 ME 47 ¶ 8, 708 A.2d 269, 271 (internal punctuation and citation omitted). Although there are similarities between unjust enrichment and quantum meruit, the Maine Law Court has "made an effort to overcome considerable confusion between" them, explaining:

> Quantum meruit, also sometimes labeled "contract implied in fact," involves recovery for services or materials provided under an implied contract. Unjust enrichment describes recovery for the value of the benefit retained when there is no contractual relationship, but when,

62

> on the grounds of fairness and justice, the law compels performance of a legal and moral duty to pay, and the damages analysis is based on principles of equity, not contract.
>
> Damages in unjust enrichment are measured by the value of what was inequitably retained. In quantum meruit, by contrast, the damages are not measured by the benefit realized and retained by the defendant, but rather are based on the value of the services provided by the plaintiff.

*Paffhausen*, 1998 ME 47 ¶¶ 6-7, 708 A.2d at 271 (internal punctuation and citations omitted).

### 1.    Unjust Enrichment

Regarding unjust enrichment, Packgen contends that it "provided BP with technical information about Packgen's boom and the general standards for boom, and this information contributed, in part, to BP's ability to develop a general specification for boom and to realize cost savings." *Pl.'s Opp'n* at 28.

The first element of an unjust enrichment claim is that the plaintiff conferred a benefit on the defendant. Here, it is far from clear that technical information about boom that BP did not purchase or use counts as a "benefit" under the law. In *Forrest Associates v. Passamaquoddy Tribe*, 2000 ME 195, 760 A.2d 1041, the Maine Law Court considered an unjust enrichment claim following contractual negotiations that did not result in a contract. A consultant, Forrest Associates, had discussed with the Passamaquoddy Tribe the possible development of a high stakes bingo operation. *Id.*, 2000 ME 195 ¶ 2; 760 A.2d at 1042. Forrest conducted a market assessment of the operation and submitted it, along with a description of Forrest's proposed involvement in the project, in the form of an engagement letter; the Tribe did not sign the engagement letter. *Id.*, 2000 ME 195 ¶ 2; 760 A.2d at

1042-43.  Forrest and the Tribe continued to discuss the project, and, at the Tribe's request, Forrest completed additional market assessments and developed a comprehensive business plan.  *Id.*, 2000 ME 195 ¶ 3; 760 A.2d at 1043.  The parties orally agreed that Forrest would not be paid for its work unless the Tribe decided to go forward with the project.  *Id.*, 2000 ME 195 ¶ 5; 760 A.2d at 1043.  The Tribe ultimately decided not to, and never paid Forrest for any work.  *Id.*, 2000 ME 195 ¶ 6; 760 A.2d at 1043-44.  Forrest sued for breach of contract, unjust enrichment, and quantum meruit.  In reversing the trial court's judgment for Forrest on the unjust enrichment claim, the Law Court observed:

> [T]he evidence in the record fails to establish that Forrest conferred a benefit on the Tribe.  Although Forrest created the comprehensive plan and presented it to the Tribe, there is no evidence that the Tribe benefitted from either the presentation or the information contained in the plan.  To the contrary, the evidence demonstrates that Forrest made an elaborate marketing proposal to the Tribe that was ultimately rejected.  Such evidence fails to satisfy the central element of proving a benefit conferred.

*Id.*, 2000 ME 195 ¶ 15; 760 A.2d at 1046.

Packgen cites *APG, Inc. v. MCI Telecommunications Corporation*, 436 F.3d 294 (1st Cir. 2006), as the primary authority for its unjust enrichment claim.[85]  In that case, the plaintiff, APG, acted as a middleman in the sale of MCI prepaid telephone cards to CVS.  *Id.* at 297.  Ultimately, CVS and MCI bypassed APG; CVS contracted directly with MCI to buy thousands of prepaid cards annually.  *Id.*  The First Circuit allowed APG's unjust enrichment claim against MCI to go forward based on its determination that "a jury could conclude that . . . APG invested the

---

[85]     Packgen does not discuss *Forrest*.

time and effort needed to sell CVS on the MCI program, and that MCI then came along and collected the benefit without crediting . . . APG for [its] contribution." *Id.* at 306.

This case is closer to *Forrest* than to *APG*.  In *APG*, the benefit conferred upon the defendant was the marketing and promotion of a specific, lucrative business contract won by the defendant.  The defendant in *APG* arguably acted in bad faith in refusing to compensate a middleman that had "focused CVS's attention on the benefits of the MCI card" and made a "compelling" presentation.  *Id.* at 306.  *APG* was a close case, as the district court granted summary judgment for MCI on the unjust enrichment claim and the First Circuit noted in vacating that judgment that "[i]t may be, of course, that a jury would not find *unjust* enrichment, concluding, as did the magistrate judge, that what transpired was simply a matter of one competitor prevailing over another.  But we think there is enough in the record to warrant a jury's determination on whether appellant conferred a benefit that MCI ought to pay for." *Id.*

If *APG* was a close case, this is not.  Here, the benefit Packgen claims to have conferred on BP was not a specific, lucrative business contract but was, at best, the type of marginal, non-specific benefit that often accompanies failed negotiations.  Indeed, this arguable benefit appears to be even less significant than that in *Forrest*, where the plaintiff's market assessments and comprehensive business plan might have been considered valuable information whether or not the Tribe decided to go forward with the project.  Nevertheless, the Law Court described the plaintiff's

work as an "elaborate marketing proposal" that was ultimately rejected and "fail[ed] to satisfy the central element of proving a benefit conferred." *Forrest*, 2000 ME 195 ¶ 15; 760 A.2d at 1046. Packgen has provided no basis for distinguishing this case from *Forrest*. Evidence that BP assigned a "cost avoidance amount" to its manufacturer assessments shows only that BP might have conferred some benefit on itself (at a cost, given the expense BP incurred to visit Packgen's facility and conduct field tests of its boom) by conducting an assessment of Packgen, not that Packgen conferred any benefit on BP.

To the extent BP may have received some marginal informational benefit from its negotiations with Packgen, the unjust enrichment claim must still fail, since the evidence, viewed in the light most favorable to Packgen, does not support a conclusion that "the acceptance or retention of the benefit was under such circumstances as to make it inequitable for it to retain the benefit without payment of its value." *Platz*, 2009 ME 55 ¶ 27, 973 A.2d at 750. The evidence makes clear that the parties' negotiations took place in the context of a chaotic response to an emergency. Packgen initiated negotiations with BP after hearing about the oil spill and sensing a business opportunity. Packgen must accordingly have known that it faced the risk that when the spill was contained, the market for boom would collapse—which appears to be what happened. Under these circumstances, it was not inequitable for BP to "retain" whatever marginal "benefit" it might have gained through good faith but ultimately fruitless business discussions with Packgen.

## 2. Quantum Meruit

Packgen contends that "[b]ecause BP requested Packgen to manufacture boom, the facts also support a claim for quantum meruit." *Pl.'s Opp'n* at 29. Concerning the first element, which requires that "services were rendered to the defendant by the plaintiff," Packgen argues that it "provided BP with exactly the service it was looking for: a large amount of domestically produced boom." *Id.* at 30. The only boom Packgen provided BP was approximately 600 feet for a field test. The evidence, viewed in the light most favorable to Packgen, does not support the existence of an implied contract obligating BP to pay for a sample of boom provided for testing.   Quantum meruit provides no basis for requiring BP to pay for the 60,000 feet of boom that Packgen manufactured but sold to a purchaser other than BP.  The Court grants summary judgment for BP on Count IV.

### E.    Count V: Promissory Estoppel

Maine law contains the doctrine of promissory estoppel as set forth in the Restatement (Second) of Contracts § 90. *Chapman v. Bomann*, 381 A.2d 1123, 1127 (Me. 1978).  The Restatement provides:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.  The remedy granted for breach may be limited as justice requires.

RESTATEMENT (SECOND) CONTRACTS § 90(1) (1981).   BP argues that Packgen's promissory estoppel claim fails as a matter of law for three reasons: "(i) the alleged comments were oral statements of a contract which is barred by the statute of frauds, (ii) Packgen's reliance on any alleged oral statements was not reasonable,

and (iii) the alleged oral statements upon which Packgen states it relied are not specific enough to enforce." *Defs.' Mot.* at 15.

Under Maine law, it remains an open question whether promissory estoppel may be used to defeat a statute of frauds defense in a sale of goods case. *See Chapman*, 381 A.2d at 1130 ("at this time we refrain from deciding whether we should adopt the broad formulation of principle . . . contained in the Restatement (Second) of Contracts §§ [139 and] 197"); *Stearns v. Emery-Waterhouse Co.*, 596 A.2d 72 (Me. 1991) ("In *Chapman* . . . we adopted promissory estoppel as a substitute for consideration, RESTATEMENT (SECOND) OF CONTRACTS § 90, but did not decide whether it would permit a direct avoidance of the statute of frauds. *Id.* § 139"). In *Stearns*, the Law Court declined "to accept promissory estoppel as permitting avoidance of the statute in employment contracts that require longer than one year to perform." *Stearns*, 596 A.2d at 72. The Law Court noted that section 139 "may promote justice in other situations." *Id.* Section 139 provides:

> (1)   A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promise or a third person and which does induce the action or forbearance is enforceable notwithstanding the Statute of Frauds if injustice can be avoided only by enforcement of the promise.  The remedy granted for breach is to be limited as justice requires.

> (2)   In determining whether injustice can be avoided only by enforcement of the promise, the following circumstances are significant:

>> (a)   the availability and adequacy of other remedies, particularly cancellation and restitution;

>> (b)   the definite and substantial character of the action or forbearance in relation to the remedy sought;

>    (c)    the extent to which the action or forbearance corroborates evidence of the making and terms of the promise, or the making and terms are otherwise established by clear and convincing evidence;
>
>    (d)    the reasonableness of the action or forbearance;
>
>    (e)    the extent to which the action or forbearance was foreseeable by the promisor.

RESTATEMENT (SECOND) OF CONTRACTS § 139 (1981).  Although a leading treatise commends the "'flexible' balanced approach of § 139," it has received a mixed response from the courts, and it would be difficult to predict the Maine Law Court's likely position on its applicability to sales of goods.  *See* CORBIN ON CONTRACTS § 12.8 (Dec. 2012).  Packgen argued orally that the employment context is "very different" from the sale of goods; BP maintained that allowing promissory estoppel to defeat a statue of frauds defense would run counter to the Maine Legislature's intent in enacting the statute of frauds and providing for three specific exceptions, none of which is promissory estoppel.

Even if Maine law permitted it, however, the Court would not invoke its equitable powers to set aside the statute of frauds.  Equitable relief may be warranted where there is evidence that the defendant's invocation of the statute is itself a fraud.  *See Chapman*, 381 A.2d at 1128 (acknowledging "the general equitable principle that since it is the purpose of the Statute of Frauds to prevent fraud, that Statute cannot be permitted to be itself an instrument of fraud"); *cf. Dehahn*, 356 A.2d at 717 (noting that the judicial admission exception is intended "to limit the use of the statute of frauds as a shield against unfounded fraudulent

claims resting in parol, while removing from the arsenal of an unscrupulous litigant an unrighteous defense against a just claim").  Here, however, BP's denials that it entered into a binding agreement with Packgen are supported by Packgen's own statements indicating that Packgen understood the discussions to be no more than preliminary negotiations, and there is no evidence that BP is an "unscrupulous litigant" raising "an unrighteous defense against a just claim."  The evidence does not explain why, if Packgen entered into a binding agreement with BP, Packgen did not propose a written agreement as it did to PCI Products.  In addition, the promises Packgen insists BP made are broad and vague, and give little indication of the terms of the alleged contract, making it less reasonable for Packgen to have relied on them as indicative of a binding agreement.  The Court grants summary judgment for BP on Count V.

## IV.   CONCLUSION

The Court GRANTS Defendants BP Exploration & Production, Inc., and BP America Production Company's Motion for Summary Judgment (ECF No. 41).

SO ORDERED.

<u>/s/ John A. Woodcock, Jr.</u>
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 19th day of July, 2013